UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:

CHRISTINA FAMA-CHIARIZIA,

Debtor.
---------------------------------------------------------------x

Chapter 11 (Subchapter V)
Case No. 21-42341-ess

MEMORANDUM DECISION ON CONFIRMATION OF THE DEBTOR
CHRISTINA FAMA-CHIARIZIA'S CHAPTER 11 SUBCHAPTER V PLAN

*Appearances:*

Sari Placona, Esq.
Anthony Sodono III, Esq.
McManimon, Scotland & Bauman, LLC
Roseland, NJ 07068
*Attorneys for Christina Fama-Chiarizia*

Paul J. Fishman, Esq.
Benjamin Mintz, Esq.
Peta Gordon, Esq.
Justin G. Imperato, Esq.
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019
*Attorneys for George and Linda Filosa*

September 30, 2026

## Introduction

In this Memorandum Decision, the Court is called to consider the question of whether to confirm the contested Subchapter V Chapter 11 plan proposed by the Debtor, Christina Fama-Chiarizia. This question arises in the context of a thoroughly litigated dispute between Ms. Fama-Chiarizia, members of her family, and some of their former business associates, a dispute which traces its beginnings to more than a decade ago, and which has been vigorously contested in this Court and elsewhere. The occasion to reach a decision on confirmation represents an opportunity to bring some closure to these circumstances, and, as the Court describes below, to acknowledge the hard work that Ms. Fama-Chiarizia has put into her bankruptcy case and plan, and, just as much, the diligent efforts of the creditors, including George and Linda Filosa, to identify any possible issues and concerns.

## Jurisdiction and Venue

This Court has jurisdiction pursuant to Judiciary Code Sections 157(a) and 1334(a), and Bankruptcy Code Sections 1190 and 1191. This motion constitutes a "core proceeding" under 28 U.S.C. § 157(b)(2)(A) and (L), as it concerns both the administration of Ms. Fama-Chiarizia's estate and the confirmation of her plan of reorganization. Venue is proper in this Court pursuant to Judiciary Code Section 1409.

## Background

This bankruptcy case was filed more than five years ago, on September 15, 2021 (the "Petition Date"). On that date, a petition for relief under Subchapter V of Chapter 11 of the Bankruptcy Code was filed by the Debtor, Christina Fama-Chiarizia, commencing this bankruptcy case. In addition, her brother, Joseph Fama, Jr., filed a petition for relief under Subchapter V of Chapter 11. *In re Joseph Fama, Jr.*, Case No. 21-42342, (the "Joseph Fama, Jr.,

Case"). The catalyst for the filings of these bankruptcy cases was the entry of a judgment in a case before the New Jersey Superior Court (the "Filosa Action"), on December 22, 2020, against Ms. Fama-Chiarizia and Mr. Fama, Jr. (together, the "Fama Siblings"), and a construction and contracting company in which they each hold a twenty-five percent ownership interest, Industrial Urban Corp. ("IUC"). *See* Proof of Claim 10-2 at 7-13.

The action underlying the judgment arose in part out of a promissory note executed on August 14, 2015, by the Fama Siblings as guarantors on a loan made by Triboro Hardware & Industrial Supply Corporation ("Triboro"), a construction and supply company, and its owners, George and Linda Filosa (the "Filosas"), to IUC. *See* Proof of Claim 10-2 at 19-22. Under the note, the Fama Siblings agreed to be jointly and severally liable to Triboro and the Filosas in the event of a default by IUC on a principal obligation of $1,000,000. *See id.* The judgment in the Filosa Action consists of that principal obligation amount plus pre-judgment interest in the amount of $2,353,219.18, for a total of $3,353,219.18. Proof of Claim 10-2 at 10.

Further complicating, and in part causing, the Fama Siblings' situation at the time of their bankruptcy filings was additional litigation against them in New Jersey Superior Court (the "Frisina Action") brought by Anthony and Nicole Frisina (together, the "Frisinas"), who are, respectively, the manager of and the holder of the remaining fifty-percent ownership interest in IUC. *See* Proofs of Claim 11-1, 12-1. The Frisina Action was still pending when the petition was filed in this case, but since then, the Fama Siblings have reached a settlement with the Frisinas and, in July 2024, the Fama Siblings and Frisinas executed a written settlement agreement. Motion Approving Settlement Agreement Between the Chapter 11 Debtors, Industrial Urban Corp., DiFama Concrete, Inc., Industrial Construction of NJ Inc., Anthony Frisina, Lori Frisina, Nicole Frisina, and Michele Frisina Pursuant to Rule 9019 of the Federal

Rules of Bankruptcy Procedure, ECF No. 288, Exh. A (the "Frisina Settlement"). Under the Frisina Settlement, the Frisinas, along with Lori Frisina, Michele Frisina, IUC, and Industrial Construction, agreed to release claims against the Fama Siblings, Joseph Fama, Sr., IUC, and DiFama Concrete, and the Fama Siblings, Joseph Fama, Sr., and IUC agreed to release claims against the Frisinas, Lori Frisina, Michele Frisina, IUC and Industrial Construction. *See* Frisina Settlement ¶¶ 2, 3. This Court approved the Frisina Settlement in an Order, entered September 26, 2024. Order Approving the Settlement Agreement Between the Chapter 11 Debtors, Industrial Urban Corp., DiFama Concrete, Inc., Industrial Construction of NJ Inc., Anthony Frisina, Lori Frisina, Nicole Frisina, and Michele Frisina Pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, ECF No. 297.

However, the Fama Siblings and the Filosas have not been able to reach a settlement, despite their substantial efforts to do so. These efforts included a referral on February 10, 2023, by this Court to mediation with another judge of this Court, but as reflected in the mediator's report, on May 3, 2023, that effort concluded without a settlement being reached. *See* Mediation Referral Order, ECF No. 186; Stipulation and Agreed Order to Participate in Mediation, ECF No. 191; Mediator's Report, ECF No. 211.

Instead, Ms. Fama-Chiarizia's bankruptcy case has been the stage for a lengthy dispute between her and Filosas, including extensive Rule 2004 discovery and a fight over the case's Subchapter V designation on which this Court issued a Memorandum Decision and Order on September 15, 2023. *See* Memorandum Decision on the Objection to the Debtor Christina Fama-Chiarizia's Subchapter V Designation, ECF No. 238. That dispute has also led to a motion to dismiss this bankruptcy case by the Filosas. *See* Motion to Dismiss the Debtors' Chapter 11

Cases, ECF No. 308 (the "Motion to Dismiss"). And the Filosas have zealously opposed the confirmation of Ms. Fama-Chiarizia's Subchapter V Chapter 11 Plan.

*The Subchapter V Chapter 11 Plan*

Ms. Fama-Chiarizia filed her first Subchapter V Chapter 11 plan on December 15, 2021. ECF No. 63. She then filed a first amended plan on November 21, 2023, and a second amended plan on April 15, 2024. ECF Nos. 251, 277. Finally, she filed the third and last amended version of her plan on July 10, 2024. ECF No. 286 (the "Plan"). The Plan is a reorganization plan providing for an administrative expenses class, a priority tax claims class, a secured claims class for the secured lender and mortgagee on her real property, and a general unsecured class, including the Filosas' claim. Plan at 6-10.

The administrative expenses class consists of professional fees, including Subchapter V Trustee fees, in an aggregate estimated amount of $200,000, to be fully paid subject to approval by this Court. Plan at 7. The priority tax claims class consists of one claim, held by the Internal Revenue Service (the "IRS"), in the amount of $24,928.79, to be paid in full over five years in equal monthly installments. *See* Plan at 8; Proof of Claim 2-3. The sole secured claims class, Class 1, consists of a claim held by Santander Bank, N.A., in the amount of $480,055.12, arising out of a first-lien mortgage on Ms. Fama-Chiarizia's residence, to be paid in accordance with the mortgage note and contract terms. Plan at 9; Proof of Claim 4-1.

Class 2 is the class of general unsecured claims and lists the aggregate dollar amount as $13,387,749.53. Notably, the Plan was filed before Ms. Fama-Chiarizia reached the Frisina Settlement that extinguished each party's claims against the other. *See* ECF Nos. 288, 297. The Frisinas' aggregate claim against Ms. Fama-Chiarizia was for $10,000,000. Proof of Claim 11-1,

12-1. The aggregate amount of the remaining general unsecured claims, therefore, is $3,387,749.53, or the amount listed in the Plan reduced by the now-settled claims of the Frisinas.

The Plan lists several creditors in Class 2, however, not all of them filed a proof of claim.[1] Those who did are: (i) the Filosas, with a claim for $3,859,094.60, Proof of Claim 10-2; (ii) Synchrony Bank, with two claims for $10,384.65, Proof of Claim 8-1, and $6,967.30, Proof of Claim 9-1, respectively; (iii) Nissan-Infiniti LT with two claims for $899.31, Proof of Claim 6-1, and $1,001.64, Proof of Claim 7-1, respectively; (iv) Verizon with a claim for $252.29, Proof of Claim 5-1; (v) Bank of America, N.A., with a claim for $11,042.94, Proof of Claim 3-1; (vi) the IRS with a claim for $1,111.71, Proof of Claim 2-3; and (vii) ACAR Leasing LTD with a claim for $3,969.57, Proof of Claim 1-2.

The Plan provides for monthly payments of $500 over five years, or sixty months, and correctly labels Class 2 as impaired, rendering it the sole class entitled to vote. Plan at 9-10. The summary of ballots filed with this Court on November 27, 2024, shows that no member of Class 2 has voted on the Plan except for the Filosas, who voted to reject the Plan. Summary and Affirmation of Sari B. Placona, Esq. Pursuant to Local Rule 3018-1 Regarding Certification of Ballots Accepting or Rejecting Third Amended Subchapter V Debtor's Plan of Reorganization, ECF No. 321 (the "Balloting Summary").

Under the "Means for Implementation of the Plan" section, Ms. Fama-Chiarizia states that the Plan will be funded in two ways: payments from herself out of her disposable income, and equity available in her assets. Plan at 11. She further states that additional funds may become available, depending on the outcome of the Frisina Action. *Id.* But, as stated earlier,

[1] The Plan lists four general unsecured creditors, Comenity/Victoria's Secret, Industrial Urban Corp., PC Richards, and TD Bank/Target Credit, with a total claim value of $11,349.35. *See* Plan at 4. None of these creditors has filed a proof of claim.

that claim is now extinguished alongside the Frisinas' claims against Ms. Fama-Chiarizia, so any recovery that could potentially have come from the Frisina Action is no longer a possible source of funds for the Plan. ECF No. 297. With respect to the payments from her disposable income, Ms. Fama-Chiarizia states that she "will have enough cash through her salary to make payments under the Plan." Plan at 13. In a declaration separately filed on November 27, 2024, she also states that her father, Joseph Fama, Sr., "will assist me if needed to meet payments under" the Plan. Declaration of Christina Fama-Chiarizia, ECF No. 322 ("Fama-Chiarizia Decl."), at 9. And on December 1, 2024, Ms. Fama-Chiarizia filed an affidavit from Mr. Fama, Sr., confirming his willingness to do so. Certification of Joseph Fama, Sr., in Support of Confirmation, ECF No. 326 ("Fama, Sr., Certification in Support").

*The Filosas' Motion to Dismiss*

On November 8, 2024, the Filosas filed a Motion to Dismiss, objecting to the confirmation of the Plan and advancing arguments of gross mismanagement of the estate, bad faith, and the absence of a reasonable likelihood of reorganization. Motion to Dismiss at 3. In their Motion, the Filosas first address Ms. Fama-Chiarizia's monthly operating reports, showing a total of $579,000 in expenditures from the Petition Date through August 2024. Motion to Dismiss at 4. They argue that a significant portion of these expenditures are "extravagant and wasteful," and are, thus, a "breach of fiduciary duty to her creditors." *Id.* In their supplemental brief, to highlight her assertedly "extravagant and wasteful" expenditures, the Filosas point to a total of $25,092.70 spent on clothing, $14,522.08 spent on dining and liquor, $15,454.90 spent on entertainment, $17,175.26 spent on spa treatments and at nail and hair salons, $15,728.98 spent on gifts, and $1,747.87 spent on gambling, between October 2021 and September 2024. Filosas' Brief in Support of Their Objection to Confirmation of Debtors' Third Amended Plans of

Reorganization and in Support of Their Motions to Dismiss Debtors' Chapter 11 Cases, ECF No. 314 ("Motion to Dismiss Supp."), Exh. B (Summary of Certain Expenditures by Chiarizia).

The Filosas then contrast those expenditures with Ms. Fama-Chiarizia's many late mortgage payments, noting that thirteen out of the thirty-six mortgage payments that came due between October 2021 and September 2024 were not made on time. *See* Motion to Dismiss Supp., Exh. C (Chiarizia's Representations Concerning Her Mortgage). The issue, they argue, is not just that those payments were missed when they became due while Ms. Fama-Chiarizia was incurring many unnecessary expenses, but also that she states – incorrectly – that her mortgage payments were timely made in her monthly operating reports. *See* Motion to Dismiss Supp. at 10.

Further, they note, also missing from the reports are statements for Ms. Fama-Chiarizia's Venmo account showing a total of $13,030 received and $34,486.17 transferred to third parties during the pendency of the case, vehicle lease payments made to GM Financial by third parties on her behalf, and statements related to a bank account at J.P. Morgan that was assertedly under her control. *See* Motion to Dismiss Supp. at 12, 15, Exh. D (Chiarizia's Venmo Transactions Not Disclosed on Her Operating Reports). Statements for the J.P. Morgan account were later produced pursuant to a subpoena and disclosed a balance of $120,000 as of the Petition Date, $507,000 as of December 7, 2021, $207,000 as of April 29, 2022, $356,000 as of August 24, 2022, and $0 by May 29, 2024. Motion to Dismiss Supp. at 15.

Also noted in the Filosas' supplemental brief are two types of discrepancies that, the Filosas assert, also demonstrate bad faith and mismanagement. First, the Filosas point to a discrepancy between the rental income declared on her monthly operating reports and the rental income reported on Ms. Fama-Chiarizia's tax returns. Motion to Dismiss Supp. at 13-14. For

2023, she reported $11,400 in total rental income in her monthly operating reports, while her tax returns for the same year reported none; and for 2022, she reported $11,510 in her monthly operating reports, while her tax returns reported only $5,700. Motion to Dismiss Supp. at 13-14. Second, the Filosas point to a series of transfers of money from JNR Flooring Inc. ("JNR"), Joseph Fama, Jr.'s company, and Chris MF, a limited liability company formed by Ms. Fama-Chiarizia to provide consulting and bookkeeping services. Motion to Dismiss Supp. at 14. Between October 1, 2021, and September 30, 2022, those transfers totaled $533,905, but they were not disclosed by Ms. Fama-Chiarizia. Motion to Dismiss Supp., Exh. K (Undisclosed Funds that Fama Received from JNR).

*Ms. Fama-Chiarizia's Motion to Disallow the Filosas' Vote*

On November 22, 2024, shortly after the Motion to Dismiss was filed, Ms. Fama-Chiarizia filed a motion to disallow the Filosas' vote. Debtors' Motion Disallowing Votes of Creditor George Filosa on Debtors' Subchapter V Chapter 11 Plans due to Bad Faith, ECF No. 316 (the "Motion to Disallow"). In the Motion to Disallow, Ms. Fama-Chiarizia asks this Court to invalidate the Filosas' vote on the Plan on grounds, among others, that their several oppositions and attempts to have her case dismissed are more based on a desire for vengeance against her father, unrelated to her bankruptcy case, rather than any real economic interest. *See* Motion to Disallow at 2. She points to several statements made by Mr. Filosa during his deposition on March 26, 2024, as evidence of this animus. *Id*. First, she notes that when asked whether he was aware that a creditor in a debtor's bankruptcy has a duty of good faith, Mr. Filosa responded in the negative. Motion to Disallow at 3. Next, she notes that when asked about the Plan, Mr. Filosa stated he was not aware of it. *Id.* And when asked whether he had considered the costs of prosecuting his claim, Mr. Filosa indicated that he was not concerned about it. *Id.*

Ms. Fama-Chiarizia urges the Court to take these statements as indicative of a lack of legitimate economic interests motivating the Filosas' conduct in her bankruptcy case, and, because of that, requests that their vote be disallowed. *See* Motion to Disallow at 13.

*Ms. Fama-Chiarizia's Opposition to the Filosas' Motion to Dismiss*

On November 27, 2024, Ms. Fama-Chiarizia filed opposition to the Motion to Dismiss. Debtor's (i) Opposition to George and Linda Filosa's Motion to Dismiss the Debtor's Chapter 11 Case and Filosas' Objection to Confirmation of Debtor's Plan; and (ii) Brief in Support of Confirmation of the Debtor's Third Amended Plan, ECF No. 323 (the "Motion to Dismiss Opp."). In her opposition, Ms. Fama-Chiarizia first notes that the Filosas are the sole creditors opposing her Plan and argues that the Filosas' opposition is based on a personal vendetta arising out of inter-familial animosity that predates her bankruptcy case. *See* Motion to Dismiss Opp. at 2. Ms. Fama-Chiarizia denies the Filosas' assertions of excessive and unnecessary spending, responding that the figures in the Filosas' brief are entirely reasonable, when one considers that they account for three years of expenditures and are the expenses of a family of five. *See* Motion to Dismiss Opp. at 5, 7-8.

With respect to the late mortgage payments identified by the Filosas in the Motion to Dismiss, Ms. Fama-Chiarizia disagrees that they are a problem that rises to the level of bad faith, and responds that it is not unusual for a debtor in bankruptcy to encounter "bumps in the road" and to require "a bit of time to right the ship." Motion to Dismiss Opp. at 8. She asserts that she is committed to repaying her debts and argues that her conduct shows this to be the case. *Id*. Ms. Fama-Chiarizia illustrates this point by noting, as an example, that she used the insurance proceeds from her recently lost engagement ring (the "Engagement Ring") towards making her

mortgage payments, as opposed using those funds, in the alternative, to buy "material items, such as clothing or a new bag," which would not help her proceed to confirmation of her Plan. *Id*.

With respect to the vehicle lease payments identified by the Filosas in their Motion to Dismiss, Ms. Fama-Chiarizia explains that the payments were made by her brother, who was making the payments because the vehicle is owned and insured by his company, JNR, and that, if anything, this has allowed for more funds to be available to fund the Plan. Motion to Dismiss Opp. at 9.

As to the Venmo transactions noted by the Filosas, Ms. Fama-Chiarizia states that they were made both on her mother's behalf and with funds from her mother's bank account, which is linked to Ms. Fama-Chiarizia's Venmo account. *Id*. She also responds that the Filosas mischaracterize these payments as concealed in some way, because her Venmo transaction history is publicly available on Venmo's ledger, so that these payments represent a "far cry from failure to disclose." *Id*.

Finally, with respect to the discrepancies identified by the Filosas in the Motion to Dismiss between her tax returns and monthly operating reports as to reported rental income, Ms. Fama-Chiarizia responds that this was a mistake by her accountant, and that the figures reported on her monthly operating reports are, in substance, correct. *See* Motion to Dismiss Opp. at 10. Similarly, she states that the wire transfers to Chris MF listed on JNR's general ledger are mislabeled, and that, in fact, Chris MF's bank accounts were closed one month after the Petition Date. Motion to Dismiss Opp. at 10 (citing November 7, 2023, Letter Attaching JNR Ledger and Bank Statements, ECF No. 248). Ms. Fama-Chiarizia also denies that she ever had control over the J.P. Morgan account, out of which she "simply made personal and business-related payments for her father and uncle." Motion to Dismiss Opp. at 10.

*Ms. Fama-Chiarizia's Balloting Summary*

On November 27, 2024, Ms. Fama-Chiarizia filed a summary and affirmation regarding certification of ballots accepting or rejecting the Plan. *See* Balloting Summary. The Balloting Summary notes that as to Class 1, which includes the secured claim of Santander Bank, N.A., Plan at 9, the class is unimpaired and therefore is deemed to have voted to accept the Plan, and, as to Class 2, only one vote was filed, on behalf of George and Linda Filosa, rejecting the Plan. Balloting Summary ¶¶ 6-8. Accordingly, the Balloting Summary notes that Class 1 is deemed to have accepted the Plan, and "Class 2 is deemed to have rejected the Plan unless the Court disallows the vote of [the] Filosa[s]." Balloting Summary ¶ 11. *See* Balloting Summary ¶¶ 10-12.

*The Declaration of Ms. Fama-Chiarizia in Support of Confirmation*

On November 27, 2024, Ms. Fama-Chiarizia filed a declaration in support of confirmation of the Plan. In her declaration, she states, "[t]he only objection has been by the Filosas who are merely trying to destroy my family and [have] no other economic reason to pursue their claim." Fama-Chiarizia Decl. ¶ 4.

*Mr. Fama, Sr.'s, Certification in Support of Confirmation*

On December 1, 2024, Ms. Fama-Chiarizia filed a certification by her father, Joseph Fama, Sr., in support of confirmation in this case. In the Certification in Support, Mr. Fama, Sr., certifies, under penalty of perjury, that he will "fund any shortfall that [Ms. Fama-Chiarizia] has in making her monthly payments to her creditors under [the Plan]," in addition to making provisions for covering payments to the Subchapter V Trustee, and payments to Ms. Fama-Chiarizia's attorneys in this case. Fama, Sr. Certification in Support ¶ 4. *See* Fama, Sr., Certification in Support ¶¶ 4-6.

*The December 2024 Evidentiary Hearings on Confirmation*

On December 2 and 3, 2024, the Court held evidentiary hearings on confirmation of Ms. Fama-Chiarizia's Plan, at which Ms. Fama-Chiarizia testified on the issue of confirmation of the Plan, and the parties introduced evidence in support of and in opposition to confirmation of the Plan. *See* December 2, 2024, Hearing Transcript, ECF No. 328 (the "December 2, 2024, Tr."); December 3, 2024, Hearing Transcript, ECF No. 351.

During these evidentiary hearings, Ms. Fama-Chiarizia was questioned by her counsel and cross-examined by the Filosas' counsel. In particular, she was questioned about many aspects of her bankruptcy filings, as well as her personal and family income and expenses, among other matters. *See, e.g.,* December 2, 2024, Tr. at 95-96:7-19; 152-169:11-9.

The Court finds that Ms. Fama-Chiarizia was a credible and forthcoming witness, and that her testimony was consistent with, and supported by, the exhibits that were admitted into evidence.

*Mr. Fama, Sr.'s, Second Certification in Support of Confirmation*

On December 18, 2024, Ms. Fama-Chiarizia filed a second certification by Mr. Fama, Sr., in further support of confirmation in this case. Certification of Joseph Fama, Sr., in Further Support of Confirmation of Debtor's Third Amended Plan Under Subchapter V Chapter 11 of the Bankruptcy Code, ECF No. 333 (the "Fama, Sr., Second Certification in Support"). In the Certification in Support, he again certifies, under penalty of perjury, that he will fund any shortfall that Ms. Fama-Chiarizia has in making her monthly payments to her creditors under the Plan, in addition to making provisions for payments to the Subchapter V Trustee, and payments to Ms. Fama-Chiarizia's attorneys. *See* Fama, Sr., Second Certification in Support ¶¶ 4-6. He also certifies that he has already made certain payments to the Subchapter V Trustee and Ms.

Fama-Chiarizia's attorneys, as described in his first Certification. Fama, Sr., Second Certification in Support ¶ 9.

*The Fama Siblings' March 13, 2025, Letter*

On March 13, 2025, McManimon, Scotland & Bauman, LLC ("McManimon"), counsel for the Fama Siblings, filed a letter in the Joseph Fama, Jr., Case, stating that Mr. Fama, Jr., had recently consented to a dismissal of his bankruptcy case. *In re Joseph Fama, Jr.*, Case No. 21-42342, ECF No. 344, (the "March 13, 2025, Letter"), at 1. The March 13, 2025, Letter also states that Ms. Fama-Chiarizia expected to proceed in her case and to continue hearings on the confirmation of the Plan, and requested, in substance, that the Court also permit argument on the Motion to Disallow at the next hearing. *Id*. In the March 13, 2025, Letter, McManimon also made several assertions that Mr. Filosa was "harassing" Ms. Fama-Chiarizia and proceeding in bad faith. March 13, 2025, Letter at 1-2.

*The Filosas' March 14, 2025, Letter*

On March 14, 2025, the Filosas filed a letter (the "March 14, 2025, Letter"), ECF No. 340, responding to the March 13, 2025, Letter. They respond that at the next hearing in Ms. Fama-Chiarizia's case, the Court should proceed on Plan confirmation and the Motion to Dismiss, but not on the Motion to Disallow. March 14, 2025, Letter at 2. The Filosas also argue in their letter that, in substance, the allegations in the March 13, 2025, Letter as to Mr. Filosa's bad faith have "no factual basis" and are "entirely wrong." March 14, 2025, Letter at 3.

*Dismissal of the Joseph Fama, Jr., Case*

On March 31, 2025, the Court entered an Order dismissing the Joseph Fama, Jr., Case. *In re Joseph Fama, Jr.*, Case No. 21-42342, Order Dismissing the Debtor's Chapter 11 Case, ECF No. 353.

*The Filosas' May 8, 2025, Letter*

On May 8, 2025, the Filosas filed a letter stating that they had not received documents that they requested from Ms. Fama-Chiarizia concerning Mr. Fama, Sr.'s, ability to provide financial support for her Plan. Letter Concerning Joseph Fama Sr.'s Failure to Produce Documents Related to His Financial Certification, ECF No. 343 (the "May 8, 2025, Letter"), at 1-2. The Filosas requested that the Court adjourn the upcoming evidentiary hearings on confirmation and the Motion to Dismiss, scheduled for May 27, 28, and 29, 2025, until Mr. Fama, Sr., produced the requested documents regarding his financial status. May 8, 2025, Letter at 3.

*Ms. Fama-Chiarizia's First Motion to Compel Compliance*

On May 12, 2025, Ms. Fama-Chiarizia filed a motion to compel Anthony Frisina to comply with a subpoena (the "Frisina Subpoena") for document production and to schedule a deposition. Debtor's Motion for an Order Compelling Anthony Frisina To Comply with the Subpoena Issued by the Debtor Pursuant to Federal Rules of Bankruptcy Procedure 2004, ECF No. 344 (the "First Motion to Compel"), ¶ 7. In the Motion, she outlines various discovery requests made in the subpoena, and her efforts to communicate with Mr. Frisina's counsel. First Motion to Compel ¶¶ 7-10. In the absence of agreed dates for compliance with the subpoena, Ms. Fama-Chiarizia requested that the Court compel Mr. Frisina to comply with the Frisina Subpoena. First Motion to Compel ¶ 11.

On May 16, 2025, the Court held a hearing on the First Motion to Compel, at which Ms. Fama-Chiarizia, Mr. Frisina, the Filosas, and the Office of the United States Trustee appeared and were heard. Based on the entire record, including the record of the May 16, 2025, hearing, the Court directed Ms. Fama-Chiarizia and Mr. Frisina to submit a proposed order on consent,

scheduling a deposition of Mr. Frisina for May 22, 2025. But no such proposed order was submitted.

*Mr. Fama, Sr.'s, Third Certification in Support*

On May 23, 2025, Ms. Fama-Chiarizia filed a third certification by Mr. Fama, Sr., in further support of confirmation in this case. Supplemental Certification of Joseph Fama, Sr., In Further Support of Confirmation of the Debtor's Third Amended Plan Under Subchapter V Chapter 11 of the Bankruptcy Code, ECF No. 353 (the "Fama, Sr., Third Certification in Support"). In the certification, Mr. Fama, Sr., states, again under penalty of perjury, that he has sufficient monthly income to "fund any or all possible payment deficiencies that [Ms. Fama-Chiarizia]" might have over the course of her Plan. Fama, Sr., Third Certification in Support ¶ 9. *See* Fama, Sr., Third Certification in Support ¶¶ 4-9, Exhs. A-D. And, Mr. Fama, Sr., again certifies that he will fund any shortfall that Ms. Fama-Chiarizia has in making her monthly payments to her creditors under the Plan. Fama, Sr., Third Certification in Support ¶¶ 9-10.

*The May 2025 Evidentiary Hearings on Confirmation*

On May 27, 28, and 29, 2025, the Court held evidentiary hearings on the confirmation of Ms. Fama-Chiarizia's Subchapter V Chapter 11 Plan (together with the December 2 and 3, 2024, evidentiary hearings, the "Evidentiary Hearings"). At these hearings, Ms. Fama-Chiarizia and Mr. Fama, Sr., testified on the issue of confirmation of the Plan, and the parties introduced evidence in support of and in opposition to confirmation of the Plan. *See* May 27, 28, and 29, 2025, Hearing Transcripts, ECF Nos. 356, 357, 355.

During these evidentiary hearings, Ms. Fama-Chiarizia was again questioned by her counsel and cross-examined by the Filosas' counsel. In particular, she was again questioned about many aspects of her bankruptcy filings, as well as her personal and family income and

expenses, and other matters. *See, e.g.,* May 27, 2025, Hearing Transcript at 32-33:12-23; 77:8-9, ECF No. 356.

The Court finds that at these evidentiary hearings as well, Ms. Fama-Chiarizia was a credible and forthcoming witness, and that her testimony was consistent with, and supported by, the exhibits that were admitted into evidence.

Also during these evidentiary hearings, Mr. Fama, Sr., was questioned by Ms. Fama-Chiarizia's counsel and cross-examined by the Filosas' counsel about his personal finances, his commitment to support and provide a "backstop" guarantee and funds for Ms. Fama-Chiarizia's Plan, and other matters. *See, e.g.,* May 28, 2025, Hearing Transcript at 96-97:25-4, ECF No. 357; May 29, 2025, Hearing Transcript at 64:1-25, ECF No. 355.

The Court finds that at these evidentiary hearings, Mr. Fama, Sr., was a credible and forthcoming witness, and that his testimony was consistent with, and supported by, the exhibits that were admitted into evidence.

*Ms. Fama-Chiarizia's Motion for Authority to Obtain Credit*

On June 26, 2025, Ms. Fama-Chiarizia filed a motion for authority to obtain credit. Motion Pursuant to 11 U.S.C. § 364(B) Authorizing the Debtor to Continue Utilizing the Ally Bank Credit Card, ECF No. 361 (the "Credit Motion") In the Credit Motion, Ms. Fama-Chiarizia states that, without realizing that Court approval was necessary, she opened a credit card account with Ally Bank (the "Ally Credit Card") without first seeking Court approval. Credit Motion ¶¶ 8-9. And she requests approval from the Court to continue to use the Ally Credit Card account. Credit Motion ¶¶ 7-10.

*Ms. Fama-Chiarizia's Second Motion to Compel Compliance*

On June 29, 2025, Ms. Fama-Chiarizia filed a motion to compel Mr. Frisina to comply with the Frisina Subpoena. Debtor's Motion for an Order Compelling Anthony Frisina to Comply With the Subpoena Issued by the Debtor Pursuant to Federal Rules of Bankruptcy Procedure 2004 and Testify at Hearing, ECF No. 364 (the "Second Motion to Compel"). In the Motion to Compel, Ms. Fama-Chiarizia states that Mr. Frisina did not appear at a deposition scheduled for May 22, 2025, and that Mr. Frisina's counsel did not respond to her attempts to communicate. Second Motion to Compel ¶¶ 14-15, 18. And she again requests that the Court compel Mr. Frisina to comply with the Frisina Subpoena. Second Motion to Compel ¶ 21.

*The July 2025 Hearings and Settlement Conference*

On July 2, 2025, the Court held a continued hearing on confirmation, the Motion to Dismiss, and the Motion to Disallow, at which Ms. Fama-Chiarizia, the Filosas, and the Subchapter V Trustee appeared and were heard. At the July 2, 2025, hearing, the parties discussed the prospect of attempting to resolve the case by engaging in a settlement conference with the Court, and the Court scheduled a settlement conference for July 9, 2025 (the "Settlement Conference").

On July 9, 11, and 18, 2025, the Court held a Settlement Conference with Ms. Fama-Chiarizia and the Filosas. But this effort came up short, and a settlement was not reached. At the July 18, 2025, Settlement Conference, the Court scheduled continued hearings on confirmation, the Motion to Dismiss, and the Motion to Disallow for July 31, 2025, and directed the parties to confer on a briefing schedule for the Second Motion to Compel and how to proceed on confirmation, the Motion to Dismiss, and Motion to Disallow.

*The July 23, 2025, Letter*

On July 23, 2025, Ms. Fama-Chiarizia filed a letter requesting an adjournment of the hearings scheduled for July 31, 2025, as well as a hearing on the Credit Motion scheduled for August 1, 2025, and a hearing on the Second Motion to Compel scheduled for August 14, 2025, to August 21, 2025. Letter of Adjournment of July 31, 2025 Hearings, ECF No. 367.

*Withdrawal of the Motion to Disallow, the Credit Motion, and the Second Motion to Compel*

On August 7, 2025, the Filosas filed opposition to the Credit Motion and the Second Motion to Compel. The Filosas' Objection to the Debtor's Motion for Authority to Continue Utilizing the Ally Bank Credit Card, The Filosas' Objection to the Debtor's Motion for an Order Compelling Anthony Frisina to Testify at the Confirmation Hearing, ECF Nos. 372 (Credit Motion Opp.), 373 (Opp. to Second Motion to Compel).

On August 14, 2025, Ms. Fama-Chiarizia filed a notice to withdraw the Motion to Disallow and the Second Motion to Compel. Notice to Withdraw, ECF No. 374 (the "First Notice to Withdraw"). That same day, she also filed a letter requesting that the Court "set a schedule for post-trial briefing for confirmation," ECF No. 375, and a reply to the Filosas' opposition to the Credit Motion. Letter on post-trial briefing, ECF No. 375, at 1; Debtor's Reply to the Filosas' Objection to the Debtor's Motion for Authority to Continue Using the Ally Bank Credit Card, ECF No. 376.

On August 21, 2025, the Court held a continued hearing on confirmation, the Motion to Dismiss, the Motion to Disallow, the Credit Motion, and the Second Motion to Compel, at which Ms. Fama-Chiarizia, the Filosas, and the Office of the United States Trustee appeared and were heard. At that hearing, the Court granted the First Notice to Withdraw, and marked off the Motion to Disallow and Second Motion to Compel. The Court also directed Ms. Fama-Chiarizia

to refile certain monthly operating reports, and directed the parties to confer on the Credit Motion.

At the August 21, 2025, hearing, the parties indicated that they did not intend to call any further witnesses for testimony on the issues of confirmation and the Motion to Dismiss, and requested that the Court set a post-hearing briefing schedule on those matters. The Court directed the parties to confer and provide a master list of admitted exhibits by October 6, 2025. The Court also set a post-hearing briefing schedule, under which Ms. Fama-Chiarizia was to file a post-hearing brief in support of confirmation by October 20, 2025, the Filosas were to file opposition to confirmation and a brief in support of the Motion to Dismiss by November 3, 2025, Ms. Fama-Chiarizia was to file a reply to the opposition to confirmation and opposition to the Motion to Dismiss by November 17, 2025, and the Filosas were to file a reply to the opposition to the Motion to Dismiss by December 8, 2025.

On August 29, 2025, Ms. Fama-Chiarizia filed a notice to withdraw the Credit Motion. Notice to Withdraw Credit Motion, ECF No. 386.

On August 29, 2025, the parties submitted a joint stipulation and proposed order (the "Briefing Schedule Stipulation"), memorializing the briefing schedule for the post-hearing briefs on confirmation and the Motion to Dismiss established at the August 21, 2025, hearing. Notice of Proposed Joint Stipulation and Order for the Submission of Post-Evidentiary Hearing Briefing, ECF No. 387.

On August 29, 2025, the Court so-ordered and entered the Briefing Schedule Stipulation. Joint Stipulation and Order for the Submission of Post-Evidentiary Hearing Briefing, ECF No. 389.

*The Stipulation and Order as to Admission of Evidence*

On October 6, 2025, the parties filed a joint stipulation and proposed order (the "Admitted Evidence List"), providing a master list of the exhibits admitted at the December 2 and 3, 2024, and May 27, 28, and 29, 2025, evidentiary hearings on confirmation and the Motion to Dismiss. Joint Stipulation and [Proposed Order] as to the Admission of Evidence, ECF No. 391. And on October 9, 2025, the Court so-ordered and entered the Admitted Evidence List. Joint Stipulation and [~~Proposed~~ Order] as to the Admission of Evidence, ECF No. 393.

*Ms. Fama-Chiarizia's Post-Hearing Brief in Support of Confirmation*

On October 20, 2025, Ms. Fama-Chiarizia filed her post-hearing brief in support of confirmation of her Chapter 11 Plan. Debtor's Post-Evidentiary Hearing Brief in Further Support of Confirmation of the Debtor's Third Amended Plan, ECF No. 395 (the "Post-Hearing Brief in Support").

In the Post-Hearing Brief in Support, Ms. Fama-Chiarizia states that in her Plan, she proposes to pay Class 2 – general unsecured creditors – a monthly payment of $500 for 60 months and, in the alternative, reserves the right to pre-pay the total sum of the 60 monthly payments, or $30,000, in order to receive her discharge immediately. Post-Hearing Brief in Support ¶ 13. She also notes that a discharge cannot be obtained until all payments are made under Bankruptcy Code Section 1181(c). *Id*. And she observes that the Filosas, whose claim is included in Class 2, are the only creditors objecting to the Plan. *Id*. She also states that votes to accept or reject the Plan were solicited, and the Filosas' vote to reject was the only vote received. Post-Hearing Brief in Support ¶¶ 29-30.

Ms. Fama-Chiarizia argues that the Plan complies with the applicable provisions of the Bankruptcy Code, was proposed in good faith, does not discriminate unfairly among classes of

creditors, and is fair with respect to each class of claims. Post-Hearing Brief in Support ¶¶ 16-28, 31-41, 69. She states that the Plan is feasible. Post-Hearing Brief in Support ¶¶ 42-44, 68. And she argues that she has demonstrated a reasonable likelihood that she can fulfil the proposed Plan without assistance. Post-Hearing Brief in Support ¶¶ 14, 47, 51, 61.

Ms. Fama-Chiarizia also states that, if she cannot fulfil the obligations of the Plan, that Mr. Fama, Sr., has guaranteed that he will make any missed or incomplete Plan payments. Post-Hearing Brief in Support ¶¶ 14, 48. She points to the testimony of Mr. Fama, Sr., to this effect, and argues that the record supports a finding that he can make up any missed or incomplete Plan payments. Post-Hearing Brief in Support ¶¶ 49-50.

And Ms. Fama-Chiarizia states that the Plan provides for payment of all administrative expenses and tax claims, and that McManimon has consented to accepting deferred payments to make the Plan more feasible by reducing the immediate burden post-confirmation. Post-Hearing Brief in Support ¶¶ 52-53. Further, she notes that she intends to file a motion to expunge the IRS claim of $24,928 upon confirmation of the Plan on grounds that she "in good faith believes [the IRS's claim to be] worth 'zero.'" Post-Hearing Brief in Support ¶ 54.

In addition, Ms. Fama-Chiarizia addresses several specific matters identified by the Filosas in their arguments and testimony. As to the question of disclosure in her bankruptcy schedules and statements of her Engagement Ring, Ms. Fama-Chiarizia states that the record shows that she did, in fact, disclose possession of the Engagement Ring to the United States Trustee. Post-Hearing Brief in Support ¶ 55. As to the suggestion that the Plan is not feasible because Ms. Fama-Chiarizia is not current on her bills, she responds that, in fact, she is current on her bills and that she has provided a credible explanation for why, at one point, she was not.

Post-Hearing Brief in Support ¶¶ 56-57. She also states that she has now caught up, and expects to remain current on her various financial obligations. Post-Hearing Brief in Support ¶ 57.

In response to testimony elicited by the Filosas at the Evidentiary Hearings, and other statements by the Filosas suggesting that she had hidden income that she received from Chris MF, Ms. Fama-Chiarizia argues that Chris MF does not generate any income because it is no longer operational. Post-Hearing Brief in Support ¶ 58. And in response to testimony elicited by the Filosas at the Evidentiary Hearings, and other statements by the Filosas suggesting that creditors might receive more in a liquidation of her assets, Ms. Fama-Chiarizia responds that she testified, and the Plan supports, that the Plan offers creditors the best return possible. Post-Hearing Brief in Support ¶¶ 60, 67.

In response to testimony elicited by the Filosas at the Evidentiary Hearings, and other statements by the Filosas suggesting that she had concealed certain Venmo transactions, Ms. Fama-Chiarizia responds that, as she testified, the funds in Venmo transactions at issue are not from her debtor-in-possession account, and instead, that they are payments made by her mother, and that any Venmo transactions for her benefit are, in fact, shown in her monthly operating reports. Post-Hearing Brief in Support ¶ 62.

Finally, Ms. Fama-Chiarizia acknowledges that she inadvertently failed to disclose her application for and receipt of a credit card without Court approval, as addressed in the Credit Motion. Post-Hearing Brief in Support ¶ 63. She states that this was simply an "inadvertent omission," and argues that it does not outweigh her many years of compliance with the Bankruptcy Code's disclosure requirements and transparency with the Court. Post-Hearing Brief in Support ¶ 63.

*The Filosas' Post-Hearing Brief in Opposition to Confirmation*

On November 3, 2025, the Filosas filed a post-hearing brief in opposition to confirmation. The Filosas' Post-Evidentiary Hearing Brief in Further Support of Their Objection to Confirmation of the Debtor's Plan, ECF No. 398 (the "Post-Hearing Opposition Brief" or "Post-Hearing Opp. Brief").

In their Post-Hearing Opposition Brief, the Filosas first argue that the Plan is not feasible because neither Ms. Fama-Chiarizia nor Mr. Fama, Sr., has demonstrated an ability to pay the monthly amounts due under the Plan. Post-Hearing Opp. Brief at 1-18.

As to feasibility, the Filosas argue that Ms. Fama-Chiarizia cannot pay the monthly amounts due under the Plan. Post-Hearing Opp. Brief at 4-10. They note that taking everything into account, she needs to make monthly payments of at least $5,849.08, under the Plan. Post-Hearing Opp. Brief at 6. The Filosas also note that Ms. Fama-Chiarizia's average monthly net cash flow during the pendency of this bankruptcy case, since September 15, 2021, is a negative $53.05. Post-Hearing Opp. Brief at 6. And they state that at the evidentiary hearing, Ms. Fama-Chiarizia indicated that if the monthly payment under the Plan was $5,000 or greater she would not be able to make the payments, and suggested that she would only be able to make payments of $1,751. Post-Hearing Opp. Brief at 6-7.

In addition, the Filosas argue that Ms. Fama-Chiarizia can meet her current expenditures only because of support that she receives from family members, and certain windfalls that she has received, including a $81,000 workers compensation payment. Post-Hearing Opp. Brief at 6, 8. They also state that, despite payments by her husband of $2,000 per week towards the family's expenses, Ms. Fama-Chiarizia has not been able to meet all of her expenses, as shown by her missed mortgage payments – payments on which she became current only after receiving

a $81,000 workers compensation payment. Post-Hearing Opp. Brief at 9. And the Filosas argue that Ms. Fama-Chiarizia has not shown persuasive grounds to support her assertion that her income is likely to increase. Post-Hearing Opp. Brief at 10.

The Filosas next argue that the Plan is not feasible because Ms. Fama-Chiarizia's father will not be able to pay the monthly amounts due under the Plan. Post-Hearing Opp. Brief at 10-18. They note that Mr. Fama, Sr., earns $19,340.28 per month, and that his expenses are approximately $34,669 per month. Post-Hearing Opp. Brief at 10, 12-15. They also point to Mr. Fama, Sr.'s testimony that he has recently encountered difficulties with respect to his finances. Post-Hearing Opp. Brief at 10. And they observe that Mr. Fama, Sr., has agreed to pay in full, over time, some $198,741 in administrative expenses from Mr. Fama, Jr.'s bankruptcy case, amounting to payments of $10,400.10 per month. Post-Hearing Opp. Brief at 16.

And the Filosas argue that Mr. Fama, Sr.'s agreement to "backstop" the payments under Ms. Fama-Chiarizia's Plan would call for even more payments, of at least $11,545.19 per month. Post-Hearing Opp. Brief at 16. They argue that Mr. Fama, Sr.'s commitments to pay $10,000 monthly to McManimon and $5,000 monthly to the Subchapter V Trustees in both Ms. Fama-Chiarizia's and her brother's cases have gone unfulfilled, and note that those unpaid fees continue to grow. Post-Hearing Opp. Brief at 17. Finally, the Filosas note that Mr. Fama, Sr., has stated that he will sell one of his properties to fund the Plan, but, the Filosas argue, this is an entirely nonbinding and unenforceable offer. Post-Hearing Opp. Brief at 18.

The Filosas next argue that Ms. Fama-Chiarizia cannot satisfy the "Good Faith" requirement of Bankruptcy Code Section 1129(a)(3) to confirm the Plan. Post-Hearing Opp. Brief at 18-20. They assert:

> There was rampant misconduct by the Debtor; she did not propose the Plan with honesty and good intentions; and confirming the Plan would not achieve a result

> consistent with the objectives and purposes of the Bankruptcy Code. To the contrary, the Debtor, with the assistance of her family members, has engaged in a pattern of fraud and misconduct, some of it potentially criminal, throughout this Chapter 11 case.

Post-Hearing Opp. Brief at 19.

The Filosas also argue that the Plan is not fair and equitable, as required by Bankruptcy Code Section 1191(b). Post-Hearing Opp. Brief at 20-25. They assert that the Plan contains one impaired class entitled to vote, they are the only creditors in that one class who voted, and they voted in opposition to the Plan. Post-Hearing Opp. Brief at 20. For these reasons, the Filosas argue, the Plan can only be confirmed non-consensually. *Id*. And they observe that under Bankruptcy Code Section 1191(b), to show that a plan is fair and equitable for the purposes of a non-consensual confirmation, a debtor is required to show projected disposable income, and to demonstrate either that they will be able to make payments under the plan, or that there is a reasonable likelihood they will be able to make payments under the plan and that the plan provides for appropriate remedies in the event of default. Post-Hearing Opp. Brief at 21.

The Filosas advance three principal arguments in support of their position that the Plan is not fair and equitable. First, they argue that Ms. Fama-Chiarizia has not demonstrated what her projected income over the next three years will be, has only provided historical data, and has not pointed to anything that might be useful in determining her future income. Post-Hearing Opp. Brief at 21-23. Second, they argue that Ms. Fama-Chiarizia has not shown that she can make the required payments under the Plan, even with the assistance of her father. Post-Hearing Opp. Brief at 24-25. And third, they argue that Ms. Fama-Chiarizia has not shown a reasonable likelihood that she will be able to make all the required payments, and even if she had, the Plan does not include any remedies in the event of default. Post-Hearing Opp. Brief at 25.

Finally, the Filosas argue that the Plan is not in the best interests of creditors. Post-Hearing Opp. Brief at 25-28. Here, they note that Bankruptcy Code Section 1129(a)(7) requires a debtor to demonstrate, with respect to each impaired class of claims, that each holder of a claim in such class "will receive . . . under the plan on account of such claim . . . property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive . . . if the [D]ebtor were liquidated under [C]hapter 7 of this title on such date." Post-Hearing Opp. Brief at 26. They suggest that, to prove the liquidation value of her estate as of the Plan's effective date, Ms. Fama-Chiarizia simply moved the Plan, her bankruptcy schedules, and her amended bankruptcy schedules into evidence, and now asks this Court to accept the values she ascribes to her assets in those documents as sufficient proof of their liquidation value as of the Plan's effective date. Post-Hearing Opp. Brief at 27. The Filosas state that the values that Ms. Fama-Chiarizia points to are identical to those she used upon filing the petition four years ago, and do not represent any changes of the value over time or new appraisals. Post-Hearing Opp. Brief at 27. Therefore, the Filosas argue, Ms. Fama-Chiarizia has not introduced plausible evidence as to the value of her assets as of the Plan's effective date. Post-Hearing Opp. Brief at 28.

*The Subchapter V Trustee's Brief in Support of Confirmation*

Also on November 3, 2025, the Subchapter V Trustee filed a brief in support of confirmation of Plan. Subchapter V Trustee's Statement in Support of Confirmation of the Debtor's Plan, ECF No. 396 (the "Trustee's Brief in Support"). In his brief, the Subchapter V Trustee observes that he has attended the majority of the Court proceedings in the several years that Ms. Fama-Chiarizia's case has been pending, and has reviewed Ms. Fama-Chiarizia's monthly operating reports. Trustee's Brief in Support ¶¶ 5-6. Taking this into account, and

noting the "highly litigious" nature of this case, the Subchapter V Trustee states that Ms. Fama-Chiarizia "has satisfied her obligation that the [P]lan has been proposed in good faith," and argues that the Plan should be confirmed by the Court. Trustee's Brief in Support ¶ 7.

*Ms. Fama-Chiarizia's Post-Hearing Reply Brief*

On November 17, 2025, Ms. Fama-Chiarizia filed her post-hearing brief in reply to the Filosas' Post Hearing Opposition Brief. Debtor's Reply to the Filosas' (I) Postevidentiary Hearing Brief in Further Support of their Motion to Dismiss the Chapter 11 Case, and (II) Post-Evidentiary Hearing Brief in Further Support of Their Objection to Confirmation of the Debtor's Plan, ECF No. 402 (the "Post-Hearing Reply Brief").

In her reply submission, Ms. Fama-Chiarizia states that she can make the payments required by the Plan. Post-Hearing Reply Brief at 16-17. She argues that although her average monthly cash flow has indeed been a negative $53.05 during the pendency of her bankruptcy case, the supplemental contribution by her husband of $2,000 per week will permit her to make the Plan payments. Post-Hearing Reply Brief at 16. Additionally, she notes, her father, Mr. Fama, Sr., has agreed to "backstop" any shortfalls that may arise. Post-Hearing Reply Brief at 16-17.

In addition, Ms. Fama-Chiarizia argues that, while the Filosas suggest that she is only able to support herself and make the payments under her Plan with the assistance of her family members, their argument misses the significance of the fact that she has the support of her family, which contributes to making the Plan feasible. Post-Hearing Reply Brief at 16-17. And Ms. Fama-Chiarizia points out that the Plan payments will be lower than the Plan states on its face, because McManimon has agreed to defer the payments due to the firm. Post-Hearing Reply Brief at 17.

Ms. Fama-Chiarizia next argues that she has proposed the Plan in good faith. Post-Hearing Reply Brief at 18. She argues that "it is the Filosas who have relentlessly pursued [her] – spending millions of dollars in pursuit of [her in the context of her] individual bankruptcy case – which exemplifies [that] the only bad faith here is attributable to the Filosas." Post-Hearing Reply Brief at 18. And she states that the Filosas' assertions that the Plan is not proposed in good faith are grounded in unsubstantiated allegations, not facts. *Id.*

And lastly, Ms. Fama-Chiarizia argues that the Plan is fair and equitable. *Id.* She asserts that the Plan's liquidation analysis based on the sale values of her assets as of the Petition Date is appropriate in circumstances where an immediate liquidation would have occurred if the Chapter 11 case had not been filed. *Id.* And she states that this is also consistent with "the principle that losses occurring post-petition prior to confirmation are generally borne by creditors." *Id.*

*Mr. Persing's Letter in Support of Confirmation*

On November 18, 2025, Charles Persing, the Subchapter V Trustee in the Joseph Fama, Jr., Case, filed a letter in support of the confirmation of the Plan. Letter in Support of Confirmation of Christina Fama-Chiarizia's Plan, ECF No. 403 (the "Persing Letter in Support"). Mr. Persing notes that he attended many of the proceedings in this case and has had many discussions with the Subchapter V Trustee and McManimon. Persing Letter in Support at 1. He observes that Mr. Fama, Sr., has been making payments towards the accrued administrative expenses in the Joseph Fama, Jr., Case. Persing Letter in Support at 1-2. And Mr. Persing states that he believes that Ms. Fama-Chiarizia, her husband, and Mr. Fama, Sr., have "demonstrated the commitment to make the payments as required" under the Plan, and that he is "in support of the confirmation of the Plan." Persing Letter in Support at 2.

*The December 17, 2025, Confirmation Hearing*

On December 17, 2025, the Court held a continued hearing on confirmation, at which Ms. Fama-Chiarizia, Mr. Fama, Sr., the Filosas, the Subchapter V Trustee, and Mr. Persing appeared and were heard. At that hearing, Ms. Fama-Chiarizia and the Filosas argued in support of and in opposition to confirmation of the Plan. *See* December 17, 2025, Hearing Transcript, ECF No. 414 (the "December 17, 2025, Tr."). And Ms. Fama-Chiarizia's counsel stated that Mr. Fama, Sr., was prepared to deposit $30,000 in McManimon's escrow account as evidence of his ability to "backstop" the payments required under the Plan. December 17, 2025, Tr. at 99:9-21.

In light of this representation, the Court directed Ms. Fama-Chiarizia to supplement the record with respect to a payment by Mr. Fama, Sr., by December 29, 2025, and permitted the Filosas to file a response by January 9, 2026. December 17, 2025, Tr. at 102:15-24, 104:16, 106:3-4.

*Ms. Fama-Chiarizia's December 29, 2025, Letter in Support of Confirmation*

On December 29, 2025, Ms. Fama-Chiarizia filed a letter in further support of confirmation of the Plan. Letter in Further Support of Debtor's Third Amended Subchapter V Debtor's Plan of Reorganization, ECF No. 413 (the "December 29, 2025, Letter in Support"). In that letter, she states that Mr. Fama, Sr., agreed to "deposit $30,000 into" McManimon's escrow account to demonstrate his ability to "backstop" the payments required under the Plan. December 29, 2025, Letter in Support.

Attached to the letter is an affirmation of Mr. Fama, Sr. Second Supplemental Certification of Joseph Fama, Sr., in Further Support of Confirmation of the Debtor's Third Amended Plan Under Subchapter V Chapter 11 of the Bankruptcy Code, ECF No. 413-1 (the "Fama, Sr., Aff."). In that affirmation, Mr. Fama, Sr., states, under penalty of perjury, that he will

deposit $30,000 (the "Backstop Funds"), into McManimon's escrow account on or before January 31, 2026. Fama, Sr., Aff. ¶ 4. He also states that the Plan pays general unsecured creditors a total of $30,000 in equal monthly installments over the 60 months of the plan. *Id*. And he asserts that upon confirmation of the Plan, the Backstop Funds "will be disbursed to pay general unsecured creditors under the Plan within thirty (30) days of" confirmation. Fama, Sr., Aff. ¶ 5.

Finally, Mr. Fama, Sr., states that, once the Backstop Funds are disbursed, all general unsecured creditors will be satisfied under the terms of the Plan, thereby "assuring the 'feasibility' of the Plan." Fama, Sr., Aff. ¶ 6. And he observes that when the Plan is considered in conjunction with the Backstop Funds:

> [The Plan] satisfies the requirement under 11 U.S.C. § 1191(c)(3)(B)(ii) that the Plan provide appropriate remedies in the event of nonpayment. Specifically, by placing $30,000 in escrow and making the Funds available upon confirmation of the Plan, the Plan ensures adequate protection for creditors and demonstrates feasibility as required by the Bankruptcy Code. It also removes any doubt about a "remedy" since the Funds will be disbursed within thirty (30) days of an order confirming the Plan.

Fama, Sr., Aff. ¶ 9.

*The Filosas' Supplemental Opposition to Confirmation*

On January 9, 2026, the Filosas filed a supplemental opposition to confirmation of the Plan (the "Supp. Opp. Brief"), ECF No 416. They argue that the proposed use of the Backstop Funds is an unenforceable "contingent promise," and therefore cannot be used to support the Plan. Supp. Opp. Brief at 1. For this and other reasons, the Filosas again assert that Ms. Fama-Chiarizia has not established that her Plan is feasible. Supp. Opp. Brief at 1-2, 4-7. And, finally, they argue that Ms. Fama-Chiarizia does not meet the good faith requirement for confirmation of

her Plan because she is delinquent on her mortgage payments and monthly operating reports. Supp. Opp. Brief at 2-3, 8-9.

*Ms. Fama-Chiarizia's January 12, 2026, Letter in Support of Confirmation*

On January 12, 2026, Ms. Fama-Chiarizia filed a letter in further support of confirmation of the Plan. Letter in Further Support of Debtor's Third Amended Subchapter V Debtor's Plan of Reorganization, ECF No. 417 (the "January 12, 2026, Letter in Support"). In that Letter, she states that, as of January 9, 2026, the Backstop Funds were deposited into McManimon's escrow account. January 12, 2026, Letter in Support at 1. Ms. Fama-Chiarizia argues that the Backstop Funds represent additional evidence of the Plan's feasibility and her good faith. *Id*. She also states that, despite the Filosas' assertions to the contrary, she is, in fact, current on both her mortgage payments and monthly operating reports. January 12, 2026, Letter in Support at 2.

*The January 13, 2026, Confirmation Hearing and Ms. Fama-Chiarizia's Disputed Ring*

On January 13, 2026, the Court held a continued hearing on confirmation, at which Ms. Fama-Chiarizia, the Filosas, the Subchapter V Trustee, and Mr. Persing appeared and were heard. *See* January 13, 2026, Hearing Transcript, ECF No. 426 (the "January 13, 2026, Tr."). At that hearing, the Filosas called the Court's attention to recent photographs on [Ms. Fama-Chiarizia's] Instagram account" of a "ring that looks very much like the [Engagement Ring] that [Ms. Fama-Chiarizia] claimed that she lost." January 13, 2026, Tr. at 12:6, 12:5-8.

The Filosas requested that Ms. Fama-Chiarizia produce the ring that she was wearing in those photographs (the "Photo Ring"), to permit them to determine whether it was the Engagement Ring, and to establish its provenance and value. January 13, 2026, Tr. at 12:21-13:2. The Filosas acknowledged that they had not identified this question in their filings leading up to the January 13, 2026, hearings, or made the request for information about the ring known

to Ms. Fama-Chiarizia's counsel. January 13, 2026, Transcript at 14:5, 14:12. At the hearing, counsel for Ms. Fama-Chiarizia stated that the ring in the Instagram photo identified by the Filosas "is not real" and that "it is not the ring that they think it is." January 13, 2026, Tr. at 15:21-16:2.

The Court directed the parties to confer on a resolution of the Filosas' request concerning the Photo Ring, and to file a status letter on this issue by January 20, 2026. January 13, 2026, Transcript at 34:1-13. At the hearing, counsel for the Filosas suggested "that we quickly work out a procedure whereby we can have the ring examined." January 13, 2026, Tr. at 32:17-18.

*The Filosas' January 16, 2026, Status Letter*

On January 16, 2026, the Filosas filed a status letter addressing the matter of Ms. Fama-Chiarizia's ring. Status Letter Providing Update on Disputed Ring, ECF No. 420 (the "January 16, 2026, Status Letter"). The Filosas state that, while the Photo Ring bears a resemblance to the Engagement Ring, it is not the same ring. January 16, 2026, Status Letter at 1-2. They also state that, because the Photo Ring contains an artificial, laboratory-grown diamond, and not a natural diamond, the Photo Ring has a value of approximately $3,500, while the Engagement Ring was appraised at $26,000. January 16, 2026, Status Letter at 2.

*Ms. Fama-Chiarizia's January 19, 2026, Status Letter*

On January 19, 2026, Ms. Fama-Chiarizia filed a status letter addressing the matter of her ring. Letter in Response to George and Linda Filosas' January 16, 2026, Letter, ECF No. 421 (the "January 19, 2026, Status Letter"). In the letter, she states that the Photo Ring was purchased for her by her husband as a gift and further states that it is "highly doubtful" that the Photo Ring has a value of even as much as $3,500, because "lab-grown diamonds depreciate every day due to new technology and market saturation." January 19, 2026, Status Letter at 2.

*The January 20, 2026, Confirmation Hearing*

On January 20, 2026, the Court held a continued hearing on confirmation, at which Ms. Fama-Chiarizia, the Filosas, the Subchapter V Trustee, and Mr. Persing appeared and were heard. *See* January 20, 2026, Hearing Transcript, ECF No. 425 (the "January 20, 2026, Tr."). At that hearing, the parties stated that they had nothing further to add to the record on the question of confirmation of Ms. Fama-Chiarizia's Plan and the Court closed the record on the question of confirmation of the Plan. January 20, 2026, Tr. at 10:9-11.

*The Filosas' March 16, 2026, Status Letter*

On March 16, 2026, the Filosas filed a status letter. Status Letter for March 19, 2026 Hearing, ECF No. 429 (the "March 16, 2026, Status Letter"). They state that Ms. Fama-Chiarizia "made material misrepresentations to the Court concerning the status of her mortgage, or that she sat by silently while an attorney appearing on behalf of McManimon made representations to the Court that were false." March 16, 2026, Status Letter at 1. In substance, the Filosas assert that at the December 17, 2025, hearing, when Ms. Fama-Chiarizia's counsel stated that she was current on her mortgage payments, in fact she was not, as she had not yet made the December 2025 mortgage payment. March 16, 2026, Status Letter at 2. At the same time, the Filosas acknowledge that Ms. Fama-Chiarizia made her December 2025 mortgage payment later that month, on December 31, 2025. *Id*.

The Filosas also state that Ms. Fama-Chiarizia made her January 2026 mortgage payment "29 days after it was due," and, as with the December 2025 payment, her counsel "incorrectly advise[d] the Court and her creditors" that the January 2026 payment had been made and that she was current on her mortgage payments at the January 13, 2026, hearing. *Id*. And they assert that Ms. Fama-Chiarizia did not correctly indicate that she had not paid all of her bills on time on her

December 2025 and January 2026 monthly operating reports. March 16, 2026, Status Letter at 3. They also note that the bank statement filed with Ms. Fama-Chiarizia's January 2026 monthly operating report suggests that, as of February 7, 2026, she had not made her February 2026 mortgage payment, "even though it was due February 1[, 2026]." *Id.* Such omissions, the Filosas contend, show a "lack of candor, . . . bad faith, and . . . transparent disdain for the legal requirements of this proceeding." *Id.*

*Ms. Fama-Chiarizia's March 18, 2026, Status Letter*

On March 18, 2026, Ms. Fama-Chiarizia filed a status letter. Letter in Response to George and Linda Filosas' March 16, 2026, Letter, ECF No. 431 (the "March 18, 2026, Status Letter"). In that letter, she responds to the Filosas' March 16, 2026, Status Letter, and states, in substance, that it "elevat[es] an immaterial issue into an unfounded attack on the Debtor's character [and] make[s] a mountain out of a molehill – yet again – in an effort to distract from the merits before the Court." March 18, 2026, Status Letter at 1. And she states that, as of March 18, 2026, she is current on her mortgage through March 2026. *Id.*

*The March 19, 2026, Confirmation Hearing*

On March 19, 2026, the Court held a continued hearing on confirmation, at which Ms. Fama-Chiarizia, the Filosas, the Subchapter V Trustee, and Mr. Persing appeared and were heard. *See* March 19, 2026, Hearing Transcript, ECF No. 434 (the "March 19, 2026, Tr."). At that hearing, the Court again closed the record and reserved decision on the question of confirmation of Ms. Fama-Chiarizia's Plan. March 19, 2026, Tr. at 7:3-4.

*The Filosas' May 5, 2026, Status Letter*

On May 5, 2026, the Filosas filed a status letter. Status Letter Opposing Confirmation, ECF No. 436 (the "May 5, 2026, Status Letter"). They assert that at the March 19, 2026,

hearing, Ms. Fama-Chiarizia again misrepresented to the Court that her payments on her mortgage were current. May 5, 2026, Status Letter at 1. And again, they acknowledge that she subsequently made the mortgage payments at issue. May 5, 2026, Status Letter at 2. The Filosas also note that Ms. Fama-Chiarizia's monthly operating reports show that a car payment that she made was declined, and that she incurred certain expenses which the Filosas characterize as "non-essential," including expenses for "gambling, vacation travel, cosmetic procedures, and spa treatments." *Id*.

*Ms. Fama-Chiarizia's May 8, 2026, Status Letter*

On May 8, 2026, Ms. Fama-Chiarizia filed a status letter responding to the Filosas' May 5, 2026, Status Letter. Letter in Response to May 5, 2026, Letter, ECF No. 437 (the "May 8, 2026, Status Letter"). She states that while the Filosas "again attempt to portray the Debtor's MORs as deceptive [t]hey are not. The MORs accurately reflect[] the Debtor's financial status at the time of filing and disclosed the subsequent cure of the mortgage. There has been no attempt to conceal information." May 8, 2026, Status Letter at 2. And she notes that the "declined" car payment identified by the Filosas was, in fact, a duplicate payment that her husband accidentally made, and then cancelled. *Id*. Finally, Ms. Fama-Chiarizia states that the assertedly "non-essential" expenditures were, in large part "modest, infrequent, personal expenses" that were almost all tied to family activities. *Id*.

*The Filosas' July 17, 2026, Status Letter*

On July 17, 2026, the Filosas filed a status letter. Status Letter Further Opposing Confirmation, ECF No. 440 (the "July 17, 2026, Status Letter"). They assert that in the May 8, 2026, Status Letter, Ms. Fama-Chiarizia again misrepresented to the Court that her payments on her mortgage were current. July 17, 2026, Status Letter at 1-2 (noting that this representation

was false because the Debtor's "May mortgage payment was made on June 6, 2026"). And the Filosas again note that Ms. Fama-Chiarizia's monthly operating reports show that she incurred certain "non-essential" expenses, including purchases at "Christian Louboutin" and "Gucci," online gambling, a visit to a spa, and a vacation to "Wildwood, NJ." July 17, 2026, Status Letter at 2. The Filosas further note that Ms. Fama-Chiarizia has not filed her "June operating report," and may not have "made her June 2026 mortgage payment." *Id*.

*Ms. Fama-Chiarizia's July 21, 2026, Status Letter*

On July 21, 2026, Ms. Fama-Chiarizia filed a status letter responding to the Filosas' July 17, 2026, Status Letter. Letter in Response to July 17, 2026, Status Letter, ECF No. 441 (the "July 21, 2026, Status Letter"). In her letter, she describes the Filosas' status letters as "repetitive and meant solely [as] an attempt to continue to paint Ms. Fama[-Chiarizia] in a bad light because th[e Filosas'] legal and factual arguments are meritless." July 21, 2026, Status Letter at 1. She also states that the "May 2026 mortgage payment was made on April 30, 2026, and the June mortgage payment was made on June 5, 2026." *Id*. And Ms. Fama-Chiarizia explains that the expenditures identified by the Filosas as "non-essential" were gifts purchased with funds from her husband, and that these purchases did not come from her "pay and other job compensation." July 21, 2026, Status Letter at 2.

## **The Applicable Legal Standards**

*The Requirements for Confirmation*

Bankruptcy Code Section 1191(a) establishes the requirements for confirmation of a Subchapter V plan, incorporating by reference fifteen of the sixteen requirements for confirmation of a Chapter 11 plan as set forth in Bankruptcy Code Section 1129(a). These requirements are:

(1) The plan must comply with the Bankruptcy Code;

(2) The plan proponent must comply with the Bankruptcy Code;

(3) The plan must be proposed in good faith and not by any unlawful means;

(4) Any payments to be made for services rendered or for expenses incurred in connection with the case must be approved by the Court;

(5) The plan proponent must disclose the identity of any insiders of the reorganized debtor, as well as any individuals serving as officer, director, or voting trustee of the reorganized debtor;

(6) Any government agency with jurisdiction over the rates charged by the debtor must approve any rate changes provided by the plan;

(7) Each claimholder in any impaired class must either vote in favor of the plan or receive no less than what their distribution would be in a Chapter 7 case;

(8) Each class must either be unimpaired or vote in favor of the plan;

(9) Each allowed priority claim under Bankruptcy Code Section 507 must be paid in full;

(10) To the extent there is any impaired class, at least one impaired class must vote in favor of the plan;

(11) Confirmation must be unlikely to be followed by either liquidation or further reorganization other than as provided in the plan;

(12) The Chapter 11 filing fee of $1,167 prescribed by 28 U.S.C. § 1930 must be paid in full;

(13) The plan must continue all of the debtor's pre-petition retiree benefit programs;

(14) The debtor must pay all post-petition domestic support obligations; and

(15) To the extent that the debtor is not a moneyed, business, or commercial corporation, all transfers of property contemplated by the plan must comply with applicable nonbankruptcy law governing such transfers.

11 U.S.C. § 1191(a).

Ten of these requirements apply to an individual Subchapter V debtor. Because Ms. Fama-Chiarizia is an individual and not an entity, does not have domestic support obligations, and does not contemplate the transfer of any property in her Plan, the confirmation requirements set forth at Bankruptcy Code Section 1191(a)(5), (6), (13), (14), and (15), above do not apply, and the Court does not address them further.

*The Subchapter V "Cramdown" Requirements*

In many respects, the goal of a Subchapter V case is a consensual plan. As one bankruptcy court has observed, the "overarching goals of subchapter V" includes "facilitat[ing] the development of a consensual plan." *In re Trinity Legacy Consortium, LLC*, 656 B.R. 429, 440 (Bankr. D.N.M. 2023). But if, as has occurred here, a creditor objects and consensus is not achieved, then Bankruptcy Code Section 1191(b) provides a debtor with an alternative pathway to confirmation.

That is, if a debtor cannot satisfy the requirements of Section 1129(a)(8), that "[e]ach class must either be unimpaired or vote in favor of the plan;" and Section 1129(a)(10), that "[t]o the extent there is any impaired class, at least one impaired class must vote in favor of the plan;" Subchapter V and Section 1191(b) provides a pathway to confirmation if the debtor demonstrates that the plan "does not discriminate unfairly" and is "fair and equitable" as to any objecting impaired class. 11 U.S.C. §§ 1129(a)(8), 1129(a)(1), 1191(b). *See In re Hal Luftig Co.*, No. 25-CV-02580, slip op. at 10 (S.D.N.Y. Sept. 30, 2026) (observing that "Bankruptcy Code Section

1191(b) permits confirmation of a non-consensual plan if the Court finds that the plan 'does not discriminate unfairly, and is fair and equitable, with respect to each class of claims' that is impaired and has not accepted the plan.").

<u>The Absence of Unfair Discrimination as to Any Objecting Impaired Class.</u> The first criterion established by Bankruptcy Code Section 1191(b) for the confirmation of a nonconsensual Subchapter V plan is that the plan "does not discriminate unfairly . . . with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1191(b).

Courts agree that the "standards for unfair discrimination under [Bankruptcy Code Section] 1191(b) are the same as under [Bankruptcy Code Section] 1129(b)(1) – which is [the relevant similar section] applicable to other chapter 11 cases." *In re Trinity Family Prac. & Urgent Care PLLC*, 661 B.R. 793, 812 (Bankr. W.D. Tex. 2024). *See, e.g.*, *In re Lapeer Aviation, Inc.*, 2022 WL 7204871, at *8 (Bankr. E.D. Mich. Oct. 12, 2022) (observing that courts have developed various tests for the unfair discrimination requirement, and applying the "Markell test" under which a rebuttable presumption of unfair discrimination arises when there is a dissenting class, another class of the same priority, and a difference in the plan's treatment of the two classes). *See also* 8 Collier on Bankruptcy ¶ 1191.04, at 1191-15 (Richard Levin & Henry J. Sommer eds., 16th ed.) (concluding that "the rules for determining unfair discrimination in a subchapter V case re the same as they are under section 1129(b)(1) for cramdown confirmation in a non-subchapter V chapter 11 case."). Accordingly, both the legislative history and the authorities applying Section 1129(b) are instructive in the context of Subchapter V "cramdown" and confirmation.

While the Bankruptcy Code does not define unfair discrimination, the legislative history behind the Bankruptcy Code's "cramdown" provisions, including Section 1129(b), indicates that it is a distinct requirement from fair and equitable treatment. As that legislative history states, "[t]he criterion of unfair discrimination is not derived from the fair and equitable rule or from the best interests of creditors test" but instead, "it preserves just treatment of a dissenting class from the class's own perspective." H.R. Rep. No. 95-595 at 417, 1978 U.S.C.C.A.N. at 6368 (1977). In that same context, as one court has explained, the distinction is one between "vertical" protection for higher-ranked classes vis-à-vis lower-ranked ones, and "horizontal" protection for creditors at the same level of priority. *Principal Mut. Life Ins. Co. v. Baldwin Park Towne Ctr., Ltd.* (*In re Baldwin Park Towne Ctr., Ltd.*), 171 B.R. 374, 378 (Bankr. C.D. Cal. 1994).

That is, the requirement that a plan not discriminate unfairly serves to ensure that "a dissenting class will receive relative value equal given to all other similarly situated classes." *In re LightSquared Inc.*, 513 B.R. 56, 99 (Bankr. S.D.N.Y. 2014). But this does not mean that different classes cannot receive different treatment. As the same court noted, Bankruptcy Code Section 1129(b) "does not preclude a plan's disparate treatment of classes of same-priority claims." *In re LightSquared*, 513 B.R. at 99 (citing *In re Hawaiian Telecom Commc'ns, Inc.*, 430 B.R. 564, 605 (Bankr. D. Haw. 2009)).

Some courts have concluded, in the context of confirmation of a Chapter 11 plan outside of Subchapter V, that unfair discrimination is avoided if unsecured creditors, even if placed in separate classes, receive the same *pro rata* distribution under a plan. For example, in *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986), the court observed that "[g]enerally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns-Manville Corp.*, 68 B.R. at 636.

Other courts, including in the Chapter 13 context, have adopted a pragmatic approach permitting disparate treatment based on the debtor's particular facts and circumstances. For example, in *In re Curtis*, 2 B.R. 43 (Bankr. W.D. Mo. 1979), the bankruptcy court held that the full repayment of child support claims and a ten percent distribution to other unsecured creditors amounted to fair and equitable repayment of the unsecured creditors. The court observed that while, "in the absence of exceptional circumstances, a debtor [can] demonstrate[] good faith by proposing to pay at least 10% of his take-home pay over [a] three-year period," the burden of child support payments, expected increases to expenses, and likelihood of decreased income was evidence sufficient to justify the adequacy of a ten percent payment to unsecured creditors. *In re Curtis*, 2 B.R. at 45.

And in *In re Perskin*, 9 B.R. 626 (Bankr. N.D. Tex. 1981), the bankruptcy court concluded that favoring unsecured debt arising out of credit cards needed by the debtor for conducting his freelancing business was fair and equitable. In the same way, in *In re Freshley*, 69 B.R. 96 (Bankr. N.D. Ga. 1987), the bankruptcy court determined that it was fair to allow full repayment of unsecured student loan debt, but not other unsecured debt, where the debtor sought to continue his education.

<u>Fair and Equitable as to a Objecting Impaired Class.</u> The second criterion established by Bankruptcy Code Section 1191(b) for the confirmation of a nonconsensual Subchapter V plan is that the plan "is fair and equitable . . . with respect to each class of claims . . . that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1191(b). Bankruptcy Code Section 1191(c) sets forth guidance in the form of a "Rule of Construction" for "the condition that a plan be fair and equitable with respect to each class of claims and interests." 11 U.S.C. § 1191(c).

The first of these requirements establishes protection for a secured creditor, and provides that "the plan meets the requirements of section 1129(b)(2)(A)," which provides that "with respect to a class of secured claims, the plan provides . . . that the holders of such claims retain the liens securing [their] claims," and be paid their value in installments over time. 11 U.S.C. §§ 1129(b)(2)(A), 1191(c)(1).

The second requirement addresses the debtor's obligations to fund the plan, and requires, in substance, that "the plan provides that all of the projected disposable income of the debtor to be received [for the duration] of the plan will be applied to make payments under the plan." 11 U.S.C. § 1191(c)(2).

And finally, the third requirement addresses, in substance, both the feasibility of payments under the plan and the consequences if the payments are not made. It calls for the debtor to show that "[t]he debtor will be able to make all payments under the plan" or there is "a reasonable likelihood that the debtor will be able to make all payments under the plan," and that "the plan provides appropriate remedies . . . to protect the holders of claims or interests in the event that the payments are not made." 11 U.S.C. § 1191(c)(3).

In addition, the "fair and equitable" standard is a "permissive" one, and affords "bankruptcy courts [the] discretion to consider additional factors related to the 'fair and equitable' requirements" if the court so chooses, but does not require courts to consider additional factors at a party's request. *In re Hal Luftig Co.*, 667 B.R. 638, 665 (Bankr. S.D.N.Y. 2025) (declining to apply an additional test requested by a party objecting to the confirmation of a plan), *aff'd*, No. 25-CV-02580 (MMG) (S.D.N.Y. Sept. 30, 2026).

*The Burden of Proof*

Here, as in other Bankruptcy Code chapters, the proponent of the plan has the burden of proving that it meets each applicable requirement under the Bankruptcy Code. *In re Featherworks Corp.*, 25 B.R. 634, 642 (Bankr. E.D.N.Y. 1982) (stating that "[a]s the proponent of the plan, the debtor ha[s] the burden of establishing that it met the requirements of the Code."). Courts agree that the appropriate standard by which the plan proponent must prove that it meets each applicable requirement is by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) (interpreting Congress' silence in the Bankruptcy Code and its legislative history as to questions of burden of proof to indicate that it did not intend to require a heightened standard); *In re Ditech Holding Corp.*, 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019) (assessing confirmation under a "preponderance of the evidence" standard).

## **Discussion**

The Court now considers each of the requirements of Bankruptcy Code Section 1129(a) applicable to confirmation of Ms. Fama-Chiarizia's Plan. And, because the Court concludes that the Plan does not satisfy Bankruptcy Code Sections 1129(a)(8) and 1129(a)(10), the Court also considers whether the Plan may still be confirmed under the two-prong test of Bankruptcy Code Section 1191(b).

### *Whether the Plan Meets the Requirements of Section 1129(a)*

#### Bankruptcy Code Section 1129(a)(1): Whether the Plan Complies with the Applicable Provisions of the Bankruptcy Code

The first requirement for confirmation under Bankruptcy Code Section 1129(a) is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that the Plan complies with the "applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). *See In re Ditech*, 606 B.R. at 554.

While some courts interpret this requirement to address broad compliance with the Bankruptcy Code, others limit it to compliance with the provisions governing the form and content of a plan. *See In re Journal Register Co.*, 407 B.R. 520, 535 (Bankr. S.D.N.Y. 2009) (explaining the different approaches to the question of statutory compliance). The Second Circuit has adopted the narrower of the two approaches. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) (holding that "[i]t is doubtful that violations of Code provisions unrelated to the form and content of a plan . . . implicate subsection 1129(a)(1) at all").

As a starting point, Bankruptcy Code Section 1122 requires that a Chapter 11 plan classify and treat together only those claims that are substantially similar. 11 U.S.C. § 1122. Substantial similarity is similarity in legal nature, character, or effect. *See Steelcase Inc. v. Johnston* (*In re Johnston*), 21 F.3d 323, 327 (9th Cir. 1994) (explaining that "to resolve [the] question [of substantial similarity], bankruptcy judges must evaluate the nature of each claim"); *In re Coram Healthcare Corp.*, 315 B.R. 321, 349 (Bankr. D. Del. 2004) (holding that "[a] proper determination of whether claims are 'substantially similar' focuses on the nature of the claims"); *In re Dow Corning Corp.*, 244 B.R. 634, 644 (Bankr. E.D. Mich. 1999) (noting that, for the purposes of Bankruptcy Code Section 1122, "'[s]ubstantially similar' means [that the claims are] similar in legal nature, character or effect").

In this Circuit, and most others, similar claims may still be separately classified if the classification is based on a legitimate or reasonable business or economic rationale. *See Frito-Lay, Inc. v. LTV Steel Co.* (*In re Chateaugay Corp.*), 10 F.3d 944, 956-57 (2d Cir. 1993) (holding that separate classification of similar claims with some rational basis is permissible). *See also* 7 Collier on Bankruptcy ¶ 1122.03[1] n.7 (Richard Levin & Henry J. Sommer eds., 16th ed.) (collecting cases supporting the rule that "separate classification of otherwise substantially

similar claims and interests is acceptable as long as the plan proponent can articulate a 'reasonable' justification for such separate classification").

Here, the record shows that the Plan satisfies Bankruptcy Code Section 1122. First, the Plan appropriately assigns the sole secured claim into its own class. *See* Plan at 6-10. Secured and unsecured claims are inherently dissimilar because they differ in legal nature, so separate classification is necessary. *See In re D&W Realty Corp.*, 165 B.R. 127, 129 (Bankr. S.D.N.Y. 1994) (stating that "a secured claim and an unsecured claim, even those of the same creditor, are about as dissimilar as two claims can be").

Second, the Plan appropriately classifies unsecured claims based on their priority, with administrative expenses at the top and general unsecured claims at the bottom. *See* Plan at 6-10. Claims with different priority are dissimilar because although they may be comparable in nature – they are all unsecured – they differ in character and effect, so separate classification is required. *See Phoenix Mutual Life Ins. Co. v. Greystone III Joint Venture* (*In re Greystone III Joint Venture*), 995 F.2d 1274, 1278-79 (5th Cir. 1991).

And third, the Plan appropriately groups together the claims of Class 2, all of which are unsecured and of equal priority. *See* Plan at 6-10.

Bankruptcy Code Sections 1123 and 1190 add additional requirements for a Subchapter V Chapter 11 plan. 11 U.S.C. §§ 1123, 1190. Those applicable here under Bankruptcy Code Sections 1123(a)(1) to 1123(a)(5) are:

(1) The plan must designate classes of claims and interests pursuant to Bankruptcy Code Section 1122;

(2) The plan must specify which classes are impaired and not impaired;

(3) The plan must specify the treatment to be afforded to each class;

> (4) Treatment must be equal across all claims within the same class, absent agreement to the contrary; and
>
> (5) The plan must provide adequate means for its implementation, such as the retention by the debtor of all or any part of the property of the estate, the transfer of any or all of the property of the estate, or the sale of all or any part of the property of the estate;

11 U.S.C. §§ 1123(a)(1)-(5).

And those applicable here under Bankruptcy Code Sections 1190(1) and 1190(2) are:

> (1) The plan must include a brief history of the debtor's business, a liquidation analysis, and projections as to the debtor's ability to make the plan payments; and
>
> (2) The plan must provide for the submission of the debtor's future earnings to the Subchapter V trustee.

11 U.S.C. §§ 1190(1)-(2).

Here, the record shows that the Plan complies with the requirements in Bankruptcy Code Sections 1123 and 1190. The Plan identifies impaired and unimpaired classes and describes the treatment for each. *See* Plan at 6-10. It provides for equal treatment to claims within the same class. *Id.* It describes Ms. Fama-Chiarizia's employment and business affiliations, as well as her financial condition at the outset of the case. *See* Plan at 2-3. It includes a liquidation analysis. Plan at 14, Exh. B (Liquidation Analysis). It provides for Ms. Fama-Chiarizia's retention of the property of the estate and establishes her salary as the main source of funding. Plan at 11, 13. It includes projections as to Ms. Fama-Chiarizia's ability to make the Plan payments and provides for such payments to be administered through the Subchapter V Trustee. *Id*. And, as noted, the Plan classifies claims in compliance with Bankruptcy Code Section 1122.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements

of Bankruptcy Code Section 1129(a)(1), that the Plan complies with the applicable provisions of the Bankruptcy Code.

<u>Bankruptcy Code Section 1129(a)(2): Whether Ms. Fama-Chiarizia Has Complied with the Applicable Provisions of the Bankruptcy Code</u>

The second requirement for confirmation under Bankruptcy Code Section 1129(a) is that Ms. Fama-Chiarizia, as the proponent of the Plan, must show by a preponderance of the evidence that she has complied with "applicable provisions" of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). *See In re Ditech*, 606 B.R. at 554.

Here again, some bankruptcy courts construe this requirement strictly, finding that any violation of the requirements of the Bankruptcy Code, no matter how slight, warrants a denial of confirmation. *See, e.g., Cothran v. United States* (*In re Cothran*), 45 B.R. 836, 838 (S.D. Ga. 1984) (denying confirmation due to the debtor's unauthorized use of cash proceeds from sale of collateral); *In re Keiser*, 204 B.R. 697, 700 (Bankr. E.D. Pa. 1998) (denying confirmation noting that one of two co-debtors did not attend the 341 meeting of creditors, among other deficiencies); *In re Wermelskirchen*, 163 B.R. 793 (Bankr. N.D. Ohio 1994) (denying confirmation for the debtor's failure to include all creditors in the debtor's schedules).

Other courts limit the scope of Section 1129(a)(2) to more substantial and pervasive violations of the Bankruptcy Code. As one court observed, "[c]ertainly, if Congress had meant that *any* infraction, . . . no matter how minor[,] . . . should result in a denial of confirmation, Congress would have given some clearer indication" of that. *In re Landing Assocs., Ltd.*, 157 B.R. 791, 811 (Bankr. W.D. Tex. 1993) (emphasis in original).

Courts in this Circuit have applied a more focused approach in some cases and a more general approach in others. As the bankruptcy court explained in *In re Texaco Inc.*, 84 B.R. 893 (Bankr. S.D.N.Y. 1988), "[t]he principal purpose of [Bankruptcy Code] Section 1129(a)(2) is to

assure that the proponents have complied with the requirements of [Bankruptcy Code S]ection 1125 in the solicitation of acceptances to the plan" *In re Texaco Inc.*, 84 B.R. at 906-07. *See In re Ditech*, 606 B.R. at 578 (holding that Section 1129(a)(2) requires compliance with provisions outside of Chapter 11).

The legislative history of Section 1129(a)(2) links this requirement to matters of disclosure. *See* H.R. Rep. No. 95-595 at 412, 1978 U.S.C.C.A.N. at 6368 (1977). It states that this Section "requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as Section 1125, regarding disclosure." *Id*.

The adequacy of the debtor's disclosure is essential in Subchapter V as well. Under Bankruptcy Code Section 1187, a Subchapter V debtor must file its most recent balance sheet, statement of operations, cash flow statement, and Federal income tax return, petition schedules and a statement of financial affairs, monthly operating reports required by Bankruptcy Code Section 308, and any additional documentation required by the Local Bankruptcy Rules. 11 U.S.C. §§ 1187(a)-(b). And under Bankruptcy Code Section 1189, a Subchapter V debtor must also file a plan within ninety days from the petition date. 11 U.S.C. § 1189(b).

Here, the record shows that Ms. Fama-Chiarizia has substantially complied with the Bankruptcy Code's extensive disclosure requirements. She filed her petition on September 15, 2021, including Schedules A/B through J, a statement of financial affairs, a summary of assets and liabilities, a list of her twenty largest unsecured creditors, disclosure of attorney compensation, and creditor matrix. *See* Petition, ECF No. 1.

On the same day, Ms. Fama-Chiarizia also filed a pre-petition statement as required by Local Bankruptcy Rule 2017-1, a certificate of credit counseling, copies of pay statements, and the affidavit required by Local Bankruptcy Rule 1007-4. *See* Statement Pursuant to Local Rule

2017, ECF No. 2; Certificate of Counseling, ECF No. 3; Pay Statements, ECF No. 4; Affidavit of Christina Fama-Chiarizia Pursuant to Local Bankruptcy Rule 1007-4, ECF No. 5. And less than a week later, she filed a balance sheet, a statement of operations and cash flow statement, and her tax returns within the September 22, 2021, deadline set by the Court's notice of deficient filing. *See* Notice of Deficient Filing – Chapter 11 Individual, ECF No. 6; Balance Sheet – Christina Fama Assets and Liabilities as of Petition Date, ECF No. 8; Small Business Subchapter V Tax Return for the Year for 2019, ECF No. 9; Affidavit of Christina Fama-Chiarizia, ECF No. 13.

Each month thereafter, Ms. Fama-Chiarizia filed monthly operating reports, of which only a small fraction was late by more than one week from the twenty-day deadline under Local Bankruptcy Rule 2015-1, and none of which was incomplete. *See* Monthly Operating Reports for September, 2021 to August, 2026, ECF Nos. 36, 38, 55, 66, 71, 74, 80, 83-89, 91, 98, 107, 127, 142, 150, 162, 170, 176, 190, 193, 209, 212, 224, 229, 233, 240, 244, 252, 256, 263, 271, 274, 276, 278-79, 281-83, 287, 293, 298, 307, 318, 334, 336-37, 341, 343, 354, 363, 369, 378-81, 383, 394, 399, 406, 411, 423-24, 432-33, 438-39, 442, 444-45.

Lastly, Ms. Fama-Chiarizia filed her original Chapter 11 plan before the expiration of the ninety-day deadline, on December 14, 2021. Subchapter V Debtor's Plan of Reorganization, ECF Nos. 61, 63.

The Filosas assert that Ms. Fama-Chiarizia has not acted in compliance with the requirements of the Bankruptcy Code because she has, from time to time, filed her monthly operating reports late. *See*, *e.g.*, Supp. Opp. Brief at 2-3, 8-9. And as the record shows, that is correct. But it is also correct that Ms. Fama-Chiarizia has regularly filed her monthly operating reports, and while some have been late, they have largely been filed within days or a few weeks of the deadline. *See* Monthly Operating Reports for September, 2021 to August, 2026, ECF Nos.

36, 38, 55, 66, 71, 74, 80, 83-89, 91, 98, 107, 127, 142, 150, 162, 170, 176, 190, 193, 209, 212, 224, 229, 233, 240, 244, 252, 256, 263, 271, 274, 276, 278-79, 281-83, 287, 293, 298, 307, 318, 334, 336-37, 341, 343, 354, 363, 369, 378-81, 383, 394, 399, 406, 411, 423-24, 432-33, 438-39, 442, 444-45.

In addition, when the Filosas noted possible inaccuracies and raised questions in connection with Ms. Fama-Chiarizia's monthly operating reports and other filings and disclosures, she has been promptly and diligently responsive. It is fair to say that the Filosas have applied an exceptionally high level of scrutiny to Ms. Fama-Chiarizia's monthly operating reports, her other filings, her representations to the Court in case management conferences, and even her social media accounts, over the more than five years that this case has been pending – as they are entitled to do, as a significant creditor and party in interest. But it is also fair to say that here as well, Ms. Fama-Chiarizia has been candid, thorough, and responsive.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(2), that she, as the Plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

Bankruptcy Code Section 1129(a)(3): Whether Ms. Fama-Chiarizia Has Proposed the Plan in Good Faith and Not by Any Means Forbidden by Law

The third requirement for confirmation under Bankruptcy Code Section 1129(a) is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that she has proposed the Plan in "good faith" and "not by any means forbidden by law." 11 U.S.C. § 1129(a)(3); *In re Ditech*, 606 B.R. at 554.

In essence, this requirement of good faith is at the core of where the Filosas argue that Ms. Fama-Chiarizia comes up short. It is also among the principal grounds that they advance in

support of their request that the Court deny confirmation of her Plan and dismiss her case. *See*, *e.g.*, Motion to Dismiss at 3-7. In their opposition to confirmation and in many other filings, the Filosas state that Ms. Fama-Chiarizia has engaged in an extensive pattern of misleading and fraudulent conduct aimed at concealing important financial information from both the Court and her creditors, and that this pattern rises to the level of being clear evidence of her bad faith. *Id*.

The requirement of good faith "speaks more to the process of plan development than to the content of the plan." *In re Emmons-Sheepshead Bay Dev. LLC*, 518 B.R. 212, 225 (E.D.N.Y. 2014). It is about a debtor's authentic and honest belief that they need to reorganize their financial affairs and their genuine intent to accomplish that reorganization successfully through their proposed plan. *See Kane*, 843 F.2d at 649. As one court explained, a plan must be proposed "with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code." *In re Coram Healthcare Corp.*, 271 B.R. 228, 234 (Bankr. D. Del. 2001). *See In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (holding that "[a] plan is proposed in good faith only if it has 'a legitimate and honest purpose to reorganize the debtor'").

Good faith is not defined in the Bankruptcy Code. In the Chapter 11 context, courts consider a variety of things in assessing whether a plan has been proposed in good faith. As this Court has previously stated, "[c]ourts interpret good faith to mean that 'there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *In re 20 Bayard Views, LLC*, 445 B.R. 83, 95 (Bankr. E.D.N.Y. 2011) (quotation marks omitted) (quoting *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984)). As this Court also found, "several courts have observed, the good faith requirement should be viewed in light of the totality of the circumstances surrounding the plan." *In re 20*

*Bayard Views*, 445 B.R. at 96. And as this Court has elsewhere noted, "'[t]he principal purpose of the Bankruptcy Code,' . . . is 'to grant a "fresh start" to the "honest but unfortunate debtor."'" *In re Homaidan*, 640 B.R. 810, 857-58 (Bankr. E.D.N.Y. 2022) (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)).

This Court has also noted that in the Second Circuit, "'[t]he good faith test means that the plan as proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected.'" *In re 20 Bayard Views*, 445 B.R. at 96 (quoting *Kane*, 843 F.2d at 649). *See*, *e.g.*, *In re Trinity Family Prac.*, 661 B.R. at 813 (setting forth a three-factor test for evaluating good faith: "(1) whether the proposed plan promotes a result consistent with the Bankruptcy Code's objectives; (2) whether the proposed plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) whether the debtor exhibited fundamental fairness in dealing with its creditors").

Here, the record shows that Ms. Fama-Chiarizia filed her bankruptcy case and proposes her Plan in order to gain a "fresh start" by "address[ing] the Filosa [Action j]udgment." Plan at 5. This is a purpose consistent with the "objectives and purposes of the Bankruptcy Code." *In re 20 Bayard Views*, 445 B.R. at 95. And she has also demonstrated a "basis for expecting that a reorganization can be expected." *In re 20 Bayard Views*, 445 B.R. at 95 (quotation marks omitted). Each of these is consistent with Section 1129(a)(3)'s requirement that Ms. Fama-Chiarizia has proposed her Plan in good faith. And there is no indication, nor even a suggestion, that she has not proposed her Plan "by any means forbidden by law." 11 U.S.C. § 1129(a)(c).

Under the Plan, Ms. Fama-Chiarizia proposes to make monthly plan payments of $500, and to fund these payments from her salary of approximately $5,000 per month. *See* Plan at 9-11, 13; December 2, 2024, Tr. at 97:2-3 (describing Ms. Fama-Chiarizia's weekly "take home

pay" to be "about [$]1,300," or "[$]5,200 more or less a month"). Further supporting this is that, together with her husband's contributions to the household income, Ms. Fama-Chiarizia has kept substantially current on her various financial obligations, including her mortgage payments. *See* December 2, 2024, Tr. at 97:11-18; March 18, 2026, Status Letter at 1.

Ms. Fama-Chiarizia's capacity substantially to meet her obligations since this case was filed is also credible and persuasive – and pragmatic – evidence that she will be able to continue to meet her obligations, including her Plan payment obligations, over the life of the Plan. There have been ups and downs, to be sure – and these are reflected in her monthly operating reports, in her bank statements, and on the record of many case management conferences – but she has continued on a path to confirmation of her Plan. And Ms. Fama-Chiarizia has done so in the context of an extraordinarily high level of scrutiny of her monthly operating reports, her other bankruptcy filings, her statements and those of her counsel in periodic case management conferences, and even her social media accounts, over the more than five years that this case has been pending.

Additional support for the conclusion that the Plan is feasible, and therefore proposed in good faith, is found in the "backstop" support to be provided by Mr. Fama, Sr., if Ms. Fama-Chiarizia does not make all of the payments due under the Plan. That is, Mr. Fama, Sr., has committed to be a guarantor of the payments to general unsecured creditors under the Plan if there is any shortfall, and he has deposited the Backstop Funds into McManimon's escrow account. *See* Fama, Sr., Certification in Support ¶¶ 4-6; Fama, Sr., Second Certification in Support ¶¶ 4-6; Fama, Sr., Aff. ¶ 5; Fama, Sr., Third Certification in Support ¶¶ 4-10, Exhs. A-D; Persing Letter in Support at 1-2; January 12, 2026, Letter in Support at 1; December 2, 2024, Tr. at 99:5-24.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(3), that she, as the Plan proponent, has proposed the Plan in good faith and not by any means forbidden by law.

<u>Bankruptcy Code Section 1129(a)(4): Whether the Fees, Costs, and Expenses in Connection with the Case and the Plan Have Been or Will Be Subject to Court Approval as Reasonable</u>

The fourth requirement for confirmation under Bankruptcy Code Section 1129(a) is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that the fees, costs, and expenses incurred in connection with the case, or in connection with her Plan and incident to the bankruptcy case, have been approved or are subject to approval by the Court. 11 U.S.C. § 1129(a)(4); *In re Ditech*, 606 B.R. at 554.

Here, the record shows that this requirement is satisfied, in both respects. First, the record shows that Ms. Fama-Chiarizia has sought and received court approval to pay the fees and costs incurred by the professionals that are representing her. These include the fees and costs of her counsel, the McManimon firm. *See* McManimon Interim Applications for Compensation and Orders, ECF No. 76 (McManimon First Interim Application for Compensation); ECF No. 82 (Order Granting McManimon First Interim Application for Compensation); ECF No. 245 (McManimon Second Interim Application for Compensation); ECF No. 257 (McManimon Amended Second Interim Application for Compensation); ECF No. 261 (Order Granting McManimon Amended Second Interim Application for Compensation); ECF No. 409 (McManimon Third Interim Application for Compensation); ECF No. 422 (Order Granting McManimon Third Interim Application for Compensation).

And second, here, the record similarly shows that the Plan places administrative expenses, including "Expenses . . . Administrative Tax Claim[s] . . . Professional fees, including

Sub V Trustee [fees] . . . [and] Clerk's Office fees," in their own class and conditions their payment on "approv[al] by the Bankruptcy Court". Plan at 7. *See* Subchapter V Trustee Interim Applications for Compensation and Orders, ECF No. 249 (Subchapter V Trustee First Interim Application for Compensation); ECF No. 261 (Order Granting Subchapter V Trustee First Interim Application for Compensation); ECF No. 390 (Subchapter V Trustee Second Interim Application for Compensation); ECF No. 407 (Order Granting Subchapter V Trustee Second Interim Application for Compensation).

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(4), that the fees, costs, and expenses incurred in connection with this bankruptcy case and her Plan have been approved by the Court, or will be subject to such approval.

<u>Bankruptcy Code Section 1129(a)(7): Whether the "Best Interest of Creditors" Test Is Met</u>

The seventh requirement for confirmation under Bankruptcy Code Section 1129(a), and the fifth of Section 1129's requirements that is applicable here, is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that the "best interest of creditors" test is met – that is, that under the Plan, an objecting impaired creditor will receive at least as much as it would otherwise receive in a Chapter 7 liquidation. 11 U.S.C. § 1129(a)(7); *In re Ditech*, 606 B.R. at 554.

Here, the record shows that Ms. Fama-Chiarizia has provided, as part of the Plan, a liquidation analysis. *See* Plan at 14, Exh. B (Liquidation Analysis). The Liquidation Analysis sets forth what would be received by the Class 2 creditors – that is, the general unsecured

creditors, including the Filosas – if Ms. Fama-Chiarizia's assets were to be liquidated in a Chapter 7 case. *Id*.

And as that analysis shows, the liquidation value of Ms. Fama-Chiarizia's assets, including cash on hand, personal property, real property, bank accounts, bonds, mutual funds, and stocks, and life insurance (and omitting the claim against the Frisinas, which was resolved in the Frisina Settlement), yields a sum that, after taking into account recoveries by secured creditors, the fees and expenses of a Chapter 7 trustee, the Chapter 11 administrative expenses, and Ms. Fama-Chiarizia's exemptions, would provide no return to the Class 2 general unsecured creditors. *Id*.

Here, the record also shows that Ms. Fama-Chiarizia filed her schedules and statements with her bankruptcy petition, and certified under penalty of perjury that the schedules were true and correct. Declaration About an Individual Debtor's Schedules, ECF No. 1. On November 11, 2021, she amended Schedule A/B to state that she had cash on hand of $1,000, personal items of $30,450, real property of $850,000, and financial assets, including life insurance, of $1,306,196.53. *See* Amended Schedule A/B, ECF No. 48. In connection with her amended schedules, Ms. Fama-Chiarizia also filed an affidavit pursuant to E.D.N.Y. LBR 1009-1(a) attesting to the filing of the amendments. *See* Affidavit Pursuant to E.D.N.Y. LBR 1009-1(a), ECF No. 48. In addition, she testified as to her property and her income during the December and May Evidentiary Hearings. And this Court has found that Ms. Fama-Chiarizia was a credible and forthcoming witness at these evidentiary hearings, and that her testimony was consistent with, and supported by, the exhibits that were admitted into evidence.

By contrast, under the Plan, the Class 2 general unsecured creditors will receive a monthly payment of $500 for 60 months, totaling $30,000 – and indeed, Ms. Fama-Chiarizia

now expects to make the full $30,000 payment to her creditors within thirty days of confirmation of the Plan. *See* Fama, Sr., Aff. ¶ 5. As she states, "[c]ritically, the Third Amended Plan offers creditors the best return possible." Post-Hearing Brief in Support ¶ 60. And there is no persuasive contrary evidence in the record.

In response, the Filosas argue that the Plan is not in the best interests of creditors, because Ms. Fama-Chiarizia must show the liquidation value of her assets as of the effective date of the Plan, as opposed to the values set forth in her Plan and her bankruptcy filings, including her schedules and amended schedules. Post-Hearing Opp. Brief at 26-27. But the Filosas do not argue that the Liquidation Analysis is based on valuations that are incorrect, or point to evidence that shows that somehow, the value of Ms. Fama-Chiarizia's assets have changed significantly. Nor do they raise a substantial question as to whether, somehow, they and the other Class 2 general unsecured creditors would be better off in a Chapter 7 liquidation.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(7), that the "best interest of creditors" test is met.

<u>Bankruptcy Code Section 1129(a)(8): Whether Each Class Has Accepted the Plan or Is Not Impaired Under the Plan</u>

The eighth requirement for confirmation under Bankruptcy Code Section 1129(a), and the sixth of Section 1129's requirements that is applicable here, is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that each class has accepted the Plan or is not impaired under the Plan – or alternatively, that the plan meets the requirements of Bankruptcy Code Section 1191(b). 11 U.S.C. § 1129(a)(8). That is, in a Subchapter V case, if Bankruptcy Code Section 1129(a)(8)'s requirements are not satisfied, the Plan may still be confirmed if it meets the

requirements of Bankruptcy Code Section 1191(b). 11 U.S.C. §§ 1129(b), 1191(b); *In re Ditech*, 606 B.R. at 554.

Under Bankruptcy Code Section 1124, a class of claims is impaired if the plan alters any legal, equitable, or contractual rights associated with any claim within the class. 11 U.S.C. § 1124(1). As the Second Circuit has noted, "[Congress] defined impairment in the broadest possible terms." *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982).

Here, the record shows that Ms. Fama-Chiarizia's Plan proposes to pay all administrative claims and Class 1 claims of secured creditors in full. *See* Plan at 6-10. And those classes are unimpaired. But the record also shows that her Plan does not propose to pay the remaining claims, in Class 2, in full. Instead, Ms. Fama-Chiarizia's Plan proposes a payment of $500 per month for 60 months, totaling $30,000, to the Class 2 general unsecured creditors. And this amounts to only a small fraction of the Class 2 claims, which total $3,894,739.15. Class 2 therefore is an impaired class, and it is the only impaired class.

Under Bankruptcy Code Section 1126, a class has accepted a plan if members that "hold at least two-thirds in amount and more than one-half in number of the allowed claims" vote to accept the plan. 11 U.S.C. § 1126(c). If the bankruptcy court determines that an entity's vote "was not in good faith," then their vote may be excluded from the computation. 11 U.S.C. § 1126(e).

The members of Class 2 are the Filosas, with a claim for $3,859,094.60, and six other creditors, with a total of $35,644.55 in claims. The Filosas cast a vote to reject the Plan, and none of the other Class 2 creditors cast a vote. *See* Balloting Summary. While Bankruptcy Code Section 1126 does not specify whether a failure to vote may be deemed an acceptance, the Court need not embark on a detailed analysis to find the answer. The Filosas hold more than 99 percent

in amount of the total Class 2 claims. That is, even if the nonvoting Class 2 members are deemed to have accepted the Plan, Section 1126(c)'s criteria for acceptance of the Plan – including acceptance by class members representing two-thirds of the dollar amount of claims – would not be satisfied. That is, Class 2, which is the sole impaired creditor class, cannot be deemed to have accepted the Plan.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has not shown by a preponderance of the evidence that the Plan satisfies the requirements of Bankruptcy Code Section 1129(a)(8), that each class has accepted the Plan or is not impaired under the Plan. As a consequence, she must demonstrate that the Plan meets the requirements of the two-prong test of Bankruptcy Code Section 1191(b), that the plan "does not discriminate unfairly" and is "fair and equitable" as to any objecting impaired class. 11 U.S.C. § 1191(b).

<u>Bankruptcy Code Section 1129(a)(9): Whether the Plan Gives Appropriate Treatment to Certain Priority Claims</u>

The ninth requirement for confirmation under Bankruptcy Code Section 1129(a), and the seventh of Section 1129's requirements that is applicable here, is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that the Plan gives the appropriate minimum treatment for certain priority claims under Bankruptcy Code Section 507. 11 U.S.C. § 1129(a)(9); *In re Ditech*, 606 B.R. at 554.

Bankruptcy Code Section 1129(a)(9)(A) requires that administrative expenses must be paid in full on the effective date of the plan, unless the claimholders agree to a different treatment. And pursuant to Bankruptcy Code Section 1129(a)(9)(C), claims by governmental units such as the IRS must likewise be paid in full, in installments over a period of time not to

exceed "[five] years from the date of the order for relief," again unless the claimholder agrees to a different treatment.

Here, the two claims entitled to priority under Bankruptcy Code Section 507 are the estimated $200,000 administrative expenses claim and $23,817.08 IRS priority claim. *See* Proof of Claim 2-3; Plan at 7-8. And here, the record shows that the Plan satisfies this requirement. That is, it seeks to repay each of these priority claims and expenses over five years from the effective date of the Plan, in equal monthly installments. Plan at 7-8.

Also, as set forth in several letters filed by Ms. Fama-Chiarizia and sworn affirmations and declarations of contribution by her father, Mr. Fama, Sr., he has committed among other things, to pay all of the amounts due to the Subchapter V Trustee and McManimon. *See* Fama, Sr., Certification in Support ¶¶ 4-6; Fama, Sr., Second Certification in Support ¶¶ 4-6; Fama, Sr., Aff. ¶ 5; Fama, Sr., Third Certification in Support ¶¶ 4-10, Exhs. A-D; Persing Letter in Support at 1-2; January 12, 2026, Letter in Support at 1; December 2, 2024, Tr. at 99:5-24. And notably, none of the priority creditors has objected to the treatment of their claim.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(9), that the Plan gives the appropriate treatment to certain priority claims.

<u>Bankruptcy Code Section 1129(a)(10): Whether an Impaired Class Has Accepted the Plan.</u>

The tenth requirement for confirmation under Bankruptcy Code Section 1129(a), and the eighth of Section 1129's requirements that is applicable here, is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that, "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan." 11 U.S.C. §

1129(a)(10); *In re Ditech*, 606 B.R. at 554. Outside of Subchapter V, this is a strict requirement in Chapter 11 cases.

But in Subchapter V cases, a debtor may pursue an alternative pathway to confirmation, and a debtor's plan may be confirmed even in the absence of an impaired consenting class, if the plan meets the requirements of Bankruptcy Code Section 1191(b). 11 U.S.C. § 1191(b).

As one court in this Circuit has explained, Section 1191(b) permits a plan to be confirmed even if it does not meet the requirements of Section 1129(a)(10). *In re Fortuna Auction LLC*, 2025 WL 3726083 at *16 (Bankr. S.D.N.Y. Dec. 19, 2025) (stating that, in light of Bankruptcy Code Section 1191(b), "[a] subchapter V case does not reed to satisfy the requirement [of Bankruptcy Code S]ection 1129(a)(10)"). As another bankruptcy court has observed:

> [Section] 1191(b) provides that the court shall confirm a subchapter V plan that satisfies the confirmation requirements under [Bankruptcy Code Section 1129(a) – other than the requirements of [Sections] 1129(a)(8), (a)(10), and (a)(15) – if the proposed subchapter V plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the subchapter V plan.

*In re Trinity Family Prac.*, 661 B.R. at 811.

And as explained above, here, there is one impaired class – the class of general unsecured creditors – and that class does not accept the Plan. That is, the members of Class 2 are the Filosas with a claim for $3,859,094.60, and six other creditors with a total of $35,644.55 in claims. The Filosas cast a vote to reject the Plan, and none of the other Class 2 creditors cast a vote. *See* Balloting Summary.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has not shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(10), that at least one impaired class has voted to accept the Plan. As a consequence, she must demonstrate that the Plan meets the requirements

of the two-prong test of Bankruptcy Code Section 1191(b), that the plan "does not discriminate unfairly" and is "fair and equitable" as to any objecting impaired class. 11 U.S.C. § 1191(b).

Bankruptcy Code Section 1129(a)(11): Feasibility

The eleventh requirement for confirmation under Bankruptcy Code Section 1129(a), and the ninth of Section 1129's requirements that is applicable here, is, in substance, that Ms. Fama-Chiarizia must show by a preponderance of the evidence that the Plan is feasible. 11 U.S.C. § 1129(a)(11); *In re Ditech*, 606 B.R. at 554.

Feasibility is a practical test. It calls for the court to assess "whether [the plan] offers a reasonable prospect of success and is workable." 7 Collier on Bankruptcy ¶ 1129.02[11], at 1129-64 (Richard Levin & Henry J. Sommer eds., 16th ed.). As one bankruptcy court has explained, the feasibility test calls for the court "to determine independently whether [a p]lan is workable and has a *reasonable likelihood* of success." *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (emphasis added). *See In re Klaynberg*, 2023 WL 5426748, at *14 (Bank. S.D.N.Y. Aug. 22, 2023) (explaining that feasibility requires that "'the Plan is workable and has a reasonable likelihood of success'" (quoting *In re Drexel Burnham Lamberg Grp.*, 138 B.R. at 762)).

And certainty is not the standard – rather, the feasibility test "requires the court to find that 'confirmation of the plan is not likely to be followed by liquidation, or need for further financial reorganization, of the debtor' . . . [and a]ll that is required is that there be *reasonable assurance* of commercial viability." *In re Texaco*, 84 B.R. at 910 (alterations omitted) (emphasis added).

Here, the record shows that under the Plan, Ms. Fama-Chiarizia proposes to make monthly plan payments of $500. *See* Plan at 9-10. And she proposes to fund these payments

from her salary of approximately $5,000 per month. *See* Plan at 11, 13; December 2, 2024, Tr. at 97:2-3. In the Plan, Ms. Fama-Chiarizia cites her statement of financial affairs and states that her income is unlikely to change over the course of the Plan's payment period. *See* Plan at 13.

Consistent with this record, Ms. Fama-Chiarizia's 2022 tax returns show total wages of $93,600, or $7,800 per month. Certification of Christina Fama-Chiarizia Regarding 2022 Tax Returns, ECF No. 259. And this figure is generally consistent with her testimony. *See, e.g.,* December 2, 2024, Tr. at 97:2-3 (describing her weekly "take home pay" to be "about [$]1,300," or "[$]5,200 more or less a month"). It is also consistent with the figures in the bank statement for Ms. Fama-Chiarizia's debtor-in-possession bank account, attached to her monthly operating reports. *See*, *e.g.*, Monthly Operating Reports, ECF Nos. 318, 334, 336-37, 341-42

And as noted above, Ms. Fama-Chiarizia's capacity substantially to meet her obligations in a reasonably timely fashion over the five years that this bankruptcy case has been pending, and to respond to questions as they arose, also supports the conclusion that she will be able to meet her Plan payment obligations over the life of the Plan. To be sure, she has done so with assistance from family members, including her husband, who has committed to make a supplemental contribution of $2,000 per week toward the household expenses. Post-Hearing Reply Brief at 16. But this is a positive consideration, not a negative one. With additional resources available in the form of her husband's contribution to help meet the household expenses, the feasibility of Ms. Fama-Chiarizia's plan is enhanced, not diminished.

Additional support for the conclusion that the Plan is feasible is found in the "backstop" support to be provided by Mr. Fama, Sr., if Ms. Fama-Chiarizia does not make all of the payments due under the Plan. That is, Mr. Fama, Sr., has committed to be a guarantor of the payments to general unsecured creditors under the Plan if there is any shortfall, and he has

deposited the Backstop Funds into McManimon's escrow account. *See* Fama, Sr., Certification in Support ¶¶ 4-6; Fama, Sr., Second Certification in Support ¶¶ 4-6; Fama, Sr., Aff. ¶ 5; Fama, Sr., Third Certification in Support ¶¶ 4-10, Exhs. A-D; Persing Letter in Support at 1-2; January 12, 2026, Letter in Support at 1; December 2, 2024, Tr. at 99:5-24. And here too, support from family members is a positive consideration, not a negative one. That is, with additional resources in the form of Mr. Fama, Sr.'s "backstop" of the Plan payments if Ms. Fama-Chiarizia comes up short, the feasibility of her Plan is enhanced, not diminished.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(11), that the Plan is feasible, and that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the debtor.

<u>Bankruptcy Code Section 1129(a)(12): Statutorily Prescribed Fees</u>

The twelfth requirement for confirmation under Bankruptcy Code Section 1129(a), and the tenth applicable in this case, is that Ms. Fama-Chiarizia must show by a preponderance of the evidence that she has paid all applicable statutorily prescribed fees. *See* 11 U.S.C. § 1129(a)(12); *In re Ditech*, 606 B.R. at 554.

One such fee is the $1,167 filing fee for Chapter 11 debtors. 28 U.S.C. § 1930(a)(3). And while ordinarily a Chapter 11 debtor must also pay quarterly fees to the Office of the United States Trustee, that requirement does not apply in Subchapter V cases. 28 U.S.C. § 1930(a)(6).

Here, the record shows that this requirement for confirmation is satisfied. Ms. Fama-Chiarizia has timely paid the filing fee of $1,167 on September 15, 2021, when she filed her

bankruptcy petition. And, as a Subchapter V debtor, she is not required to make quarterly payments to the Office of the United States Trustee.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the requirements of Bankruptcy Code Section 1129(a)(12), that she has paid all applicable statutorily prescribed fees.

* * *

For these reasons, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that she has satisfied the confirmation requirements of Bankruptcy Code Sections 1129(a)(1), (2), (3), (4), (7), (9), (11) and (12). And the Court finds and concludes that Ms. Fama-Chiarizia has not shown by a preponderance of the evidence that she has satisfied the confirmation requirements of Bankruptcy Code Sections 1129(a)(8) and (10).

*Whether the Plan Meets the Requirements of Bankruptcy Code Section 1191(b)*

The Court next turns to the question of whether Ms. Fama-Chiarizia has met the requirements of Bankruptcy Code Section 1191(b), that the Plan "does not discriminate unfairly" and is "fair and equitable" as to any objecting impaired class. 11 U.S.C. § 1191(b). This alternative pathway to confirmation is available to Chapter 11 debtors who, like Ms. Fama-Chiarizia, have elected to proceed under Subchapter V.

Having determined that Ms. Fama-Chiarizia has not satisfied the requirements of Bankruptcy Code Sections 1129(a)(8) and (10), which would otherwise be a barrier to the confirmation of the Plan, the Plan may still be confirmable under Bankruptcy Code Section 1191(b) so long as it "does not discriminate unfairly," and is "fair and equitable," with respect to

each objecting impaired class. 11 U.S.C. § 1191(b). The Court considers these two prongs in turn.

<u>The First Prong of Bankruptcy Code Section 1191(b): Whether the Plan Discriminates Unfairly with Respect to the Objecting Impaired Class</u>

The first prong of Bankruptcy Code Section 1191(b) requires that Ms. Fama-Chiarizia show, by a preponderance of the evidence, that the Plan "does not discriminate unfairly" against any objecting impaired class. 11 U.S.C. § 1191(b). That is, the first "cramdown" requirement of Section 1191(b) is satisfied where classes of equal priority receive the same treatment. As one noted commentator has observed, "the [unfair discrimination] requirement is the same as it is in a non-subchapter V chapter 11 case, under section 1129(b)(1)." 8 Collier on Bankruptcy ¶ 1191.03, at 1191-13 (Richard Levin & Henry J. Sommer eds., 16th ed.). And as one bankruptcy court has explained, "this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes." *In re Johns-Manville Corp.*, 68 B.R. at 636.

Here, Ms. Fama-Chiarizia's Plan places all of the general unsecured creditors into a single class – Class 2. As she explains, "[t]he Filosas will receive relative value equal to the value to all other similarly situated general unsecured creditors." Post-Hearing Brief in Support ¶ 40. And the Plan provides for an administrative expenses class, a priority tax claims class, a secured claims class – and each of these classes has a higher priority than the class of general unsecured creditors, including the Filosas' claim. Plan at 6-10.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that the Plan satisfies the first prong of Bankruptcy Code Section 1191(b), that the Plan does not discriminate unfairly against an objecting impaired class – here, the Class 2 general unsecured creditors, including the Filosas.

The Second Prong of Bankruptcy Code Section 1191(b): Whether the Plan Is Fair and Equitable

The second prong of Bankruptcy Code Section 1191(b) is that the Plan is "fair and equitable" in its treatment of objecting creditors. 11 U.S.C. § 1191(b). That is, "Section 1191(c) . . . states a "rule of construction" . . . [that] replaces the rules of construction for determining whether a plan is fair and equitable of [S]ection 1129(b)(2)(A)-(C)." 8 Collier on Bankruptcy ¶ 1191.04, at 1191-15 (Richard Levin & Henry J. Sommer eds., 16th ed.). This requires the debtor to satisfy up to three distinct requirements. 11 U.S.C. § 1191(c). And, as with other confirmation requirements, Ms. Fama-Chiarizia must satisfy these requirements by a preponderance of the evidence. *See Grogan*, 498 U.S. at 286.

The first requirement that the debtor must satisfy to confirm a plan over the objection of an impaired creditor is that, if the objecting creditor is a secured creditor, that it retain its lien and be paid its value in installments over time. Here, this requirement does not apply, because the Filosas – who are the sole objecting impaired creditors – are a general unsecured creditor, not a secured creditor.

The second requirement that a debtor must satisfy to confirm a plan over the objection of an impaired creditor is that the debtor commits all of their projected disposable income, or property of equivalent value, for the term of the plan to make payments under the plan. 11 U.S.C. § 1191(c)(2)(A), (B). That term may not exceed five years. *Id*. And "disposable income" is defined to include "the income that is received by the debtor and that is not reasonably necessary to be expended" for "the maintenance or support of the debtor or a dependent of the debtor" or "a domestic support that first becomes payable after the . . . filing of the petition." 11 U.S.C. §§ 1191(d)(1)(A), (B).

The question of "disposable income" in a Subchapter V case has led bankruptcy courts to look to cases under other Bankruptcy Code chapters to assess whether the disposable income test of Section 1191 has been met. As one court noted, "[t]here exists little case law analyzing the disposable income requirement in the context of a subchapter V case." *In re Cesaretti*, 2023 WL 3676888, at *14 (Bankr. D. Nev. May 10, 2023). As a consequence, the *Cesaretti* court looked to similar tests in the context of cases under other Bankruptcy Code chapters, including cases under Chapter 12 and Chapter 13. The court observed that some courts find that reasonably necessary expenses "'means adequate, but not first class, and luxury items are excluded.'" *Cesaretti*, 2023 WL 3676888, at *14 (quoting *In re McNichols*, 249 B.R. 160, 168 (Bankr. N.D. Ill. 2000)). And it noted that other courts focus on "the debtors' non-essential expenditures as a whole, rather than focusing upon them singly." *Cesaretti*, 2023 WL 3676888, at *15.

Other courts have recognized the inherent challenges associated with projecting a debtor's reasonable future income and expenses. As one bankruptcy court observed, "[t]he creation of a liquidation analysis and financial projections is not an exact science, so the Courts typically defer to the debtors' projections, subject to cross examination and/or a competing set of projections." *In re Lost Cajun Enters, LLC*, 634 B.R. 1063, 1073 (Bankr. D. Colo. 2021).

And here, the record shows that Ms. Fama-Chiarizia has shown, by a preponderance of the evidence, that her proposed payment under her Plan of $500 per month amounts satisfies the requirement that she commit all of her disposable income to her Plan, in several ways.

First, Ms. Fama-Chiarizia's monthly operating reports show that, in light of her income and obligations, her monthly net income is negative, not positive. *See* Monthly Operating Reports for September, 2021 to August, 2026, ECF Nos. 36, 38, 55, 66, 71, 74, 80, 83-89, 91, 98, 107, 127, 142, 150, 162, 170, 176, 190, 193, 209, 212, 224, 229, 233, 240, 244, 252, 256, 263,

271, 274, 276, 278-79, 281-83, 287, 293, 298, 307, 318, 334, 336-37, 341, 343, 354, 363, 369, 378-81, 383, 394, 399, 406, 411, 423-24, 432-33, 438-39, 442, 444-45. As she notes, her average monthly cash flow has been a negative $53.05 during the pendency of her bankruptcy case. Post-Hearing Reply Brief at 16.

This is also consistent with Ms. Fama-Chiarizia's testimony. When questioned about her income, she described her weekly "take home pay" to be "about [$]1,300," or "[$]5,200 more or less a month". December 2, 2024, Tr. at 97:2-3. Consistent with this, Ms. Fama-Chiarizia's bankruptcy Schedule I, filed with her petition, shows that her monthly take-home pay before rental income is "$5,210.05." Schedule I, ECF No. 1, at 2. When questioned about her husband's income, she described his weekly income as "[$]1[,]200 net," or "about another [$]5,000" a month, totaling about "[$]10,000 in household income" each month. December 2, 2024, Tr. at 97:12, 14, 16.

And indeed, the Filosas do not argue, or even suggest, that Ms. Fama-Chiarizia is somehow coming up short in her proposed monthly Plan payment. Nor do they point to other income that she could pay into the Plan. Instead, they point to the fact that Ms. Fama-Chiarizia's average monthly net cash flow during the pendency of this bankruptcy case, since September 15, 2021, is a negative $53.05. Post-Hearing Opp. Brief at 6. And they argue that, if anything, that Ms. Fama-Chiarizia is not likely to be able to make the payments contemplated by the Plan. May 5, 2026, Status Letter at 2.

The third requirement that the debtor must satisfy to confirm a plan over the objection of an impaired creditor is that there is a reasonable likelihood that they will be able to make all of the payments under the plan – and if they do not, that the plan provides appropriate remedies to protect the creditors. 11 U.S.C. § 1191(c)(3)(B). It is worth noting that by its terms, this

requirement reflects the inherent uncertainty in predicting the future path of a debtor's reorganization efforts, and calls for the Court to assess both the likelihood that the debtor will be able to meet their obligations under their plan – and that the debtor has a "Plan B", in the form of appropriate remedies to protect the creditors.

As with the question of feasibility under Bankruptcy Code Section 1129(a)(11), this requirement is, in substance, a practical one. It is also a forward-looking one, and addresses the prospect of payments over a period of at least three years, and as much as five years, in a Subchapter V plan. In this context, certainty is simply not available.

And as with feasibility, this requirement invites the Court to consider "independently . . . whether [a p]lan is workable and has a *reasonable likelihood* of success." *In re Drexel Burnham Lambert Grp.*, 138 B.R. at 762 (emphasis added). *See In re Klaynberg*, 2023 WL 5426748, at *14 (explaining that feasibility requires that "'the Plan is workable and has a reasonable likelihood of success'" (quoting *In re Drexel Burnham Lamberg Grp.*, 138 B.R. at 762)); *In re Texaco*, 84 B.R. at 910 (observing that "[a]ll that is required is that there be *reasonable assurance* of commercial viability." *In re Texaco*, 84 B.R. at 910 (alterations omitted) (emphasis added).

And here, the record shows that Ms. Fama-Chiarizia has shown, by a preponderance of the evidence, that there is a "reasonable likelihood" that she will be able to make the payments under the Plan, and just as important, that the Plan provides for "appropriate remedies" to protect the creditors "if the payments are not made." 11 U.S.C. § 1191(c)(3)(B).

As the Court has already found in considering the feasibility test of Bankruptcy Code Section 1129(a)(11), here, the record shows that under the Plan, Ms. Fama-Chiarizia proposes to make monthly plan payments of $500. *See* Plan at 9-10. And she proposes to fund these

payments from her salary of approximately $5,000 per month. *See* Plan at 11, 13; December 2, 2024, Tr. at 97:2-3. She points to her bankruptcy filings, including her statement of financial affairs, as well as her tax returns, and argues that these show that her income is unlikely to change over the course of the Plan's payment period. *See* Plan at 13; 2022 Tax Returns, ECF No. 259 (showing total wages of $93,600, or $7,800 per month).

This evidence is consistent with Ms. Fama-Chiarizia's testimony describing her weekly "take home pay" to be "about [$]1,300," or "[$]5,200 more or less a month." December 2, 2024, Tr. at 97:2-3 (describing her weekly "take home pay" to be "about [$]1,300," or "[$]5,200 more or less a month"). And this is similarly consistent with the amounts reflected in Ms. Fama-Chiarizia's debtor-in-possession bank account statements, attached to her monthly operating reports. *See*, *e.g.*, Monthly Operating Reports, ECF Nos. 318, 334, 336-37, 341-42.

Ms. Fama-Chiarizia has also shown a "reasonable likelihood that [she] will be able to make all payments under the plan" based on her record of meeting her obligations in a reasonably timely fashion over the five years that this bankruptcy case has been pending, and to respond to questions as they arose. 11 U.S.C. §1191(c)(3)(b). She has received support from household and family members, including her husband, who has committed to make a supplemental contribution of $2,000 per week toward the household expenses. Post-Hearing Reply Brief at 16. But again, this this is a positive consideration, not a negative one, and weighs in favor of, not against, the conclusion that Ms. Fama-Chiarizia will satisfy her Plan obligations.

And of course, this is not the end of the inquiry as to whether Ms. Fama-Chiarizia has met this requirement, as she must also show that the Plan provides for "appropriate remedies" to protect the creditors "if the payments [under the Plan] are not made." 11 U.S.C. § 1191(c)(3)(B).

Here, the record shows that those remedies are already in place. In his Affirmation of December 29, 2025, Mr. Fama, Sr., states, under penalty of perjury, that he will deposit the full amount of the funds necessary to make the payments required under the Plan – the $30,000 Backstop Funds – into McManimon's escrow account by January 31, 2026. Fama, Sr., Aff. ¶ 4. He also states that the Plan pays general unsecured creditors a total of $30,000 in equal monthly installments over the 60 months of the plan. *Id*. And he asserts that upon confirmation of the Plan, the Backstop Funds "will be disbursed to pay general unsecured creditors under the Plan within thirty (30) days of" confirmation. Fama, Sr., Aff. ¶ 5. When that payment is made, he states, all general unsecured creditors will be satisfied under the terms of the Plan, thereby "assuring the 'feasibility' of the Plan." Fama, Sr., Aff. ¶ 6. There is no persuasive contrary evidence in the record.

And just two weeks later, on January 12, 2026, Ms. Fama-Chiarizia confirmed that, as of January 9, 2026, the Backstop Funds were deposited into McManimon's escrow account. January 12, 2026, Letter in Support at 1. That is, by the guarantee of Mr. Fama, Sr., and his depositing of the Backstop Funds into McManimon's escrow account, the Plan provides for "appropriate remedies" to protect the creditors "if the payments [under the Plan] are not made." 11 U.S.C. § 1191(c)(3)(B). *See* Fama, Sr., Certification in Support ¶¶ 4-6; Fama, Sr., Second Certification in Support ¶¶ 4-6; Fama, Sr., Aff. ¶ 5; Fama, Sr., Third Certification in Support ¶¶ 4-10, Exhs. A-D; Persing Letter in Support at 1-2; January 12, 2026, Letter in Support at 1; December 2, 2024, Tr. at 99:5-24. Here as well, there is no persuasive contrary evidence in the record.

Therefore, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that the Plan satisfies the second prong

of Bankruptcy Code Section 1191(b), that the Plan is "fair and equitable" in its treatment of an objecting impaired class – here, the Class 2 general unsecured creditors, including the Filosas. 11 U.S.C. § 1191(b).

* * *

For these reasons, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown by a preponderance of the evidence that the Plan satisfies both prongs of Bankruptcy Code Section 1191(b).

## **Conclusion**

For the reasons stated herein, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown, by a preponderance of the evidence, that the Plan satisfies the requirements of Bankruptcy Code Sections 1129(a)(1)-(4), (7), (9), and (11)-(12), but does not satisfy the requirements of Bankruptcy Code Sections 1129(a)(8) and (10).

In addition, for the reasons stated herein, and based on the entire record, the Court finds and concludes that Ms. Fama-Chiarizia has shown, by a preponderance of the evidence, that the Plan satisfies the requirements of Bankruptcy Code Section 1191(b), because it "does not discriminate unfairly, and is fair and equitable," with respect to "each class of claims or interests that is impaired under, and has not accepted," that is, Class 2 comprised of the general unsecured creditors, including the Filosas.

Therefore, the Plan is CONFIRMED. Ms. Fama-Chiarizia is directed to submit a proposed order consistent with this Memorandum Decision confirming the Plan.

**Dated: Brooklyn, New York**
**September 30, 2026**

Elizabeth S. Stong
United States Bankruptcy Judge